Lorraine P. STANFORD, Executrix of the Estate of William L. Stanford, Plaintiff,

v.

KUWAIT AIRWAYS CORP., et al., Defendants.

Edwena R. HEGNA, Executrix of the Estate of Charles F. Hegna, Plaintiff,

v.

KUWAIT AIRWAYS CORP., et al., Defendants.

Charles KAPAR, Plaintiff,

v.

KUWAIT AIRWAYS CORP., et al., Defendants.

Nos. 85 Civ. 0477(RO), 85 Civ. 2448(RO) and 88 Civ. 7792(RO).

United States District Court, S.D. New York.

July 6, 1995.

Durant, Sabanosh, Nichols & Houston, Bridgeport, CT (Ralph P. Dupont, of counsel), Friedman Biondi & James, New York City (John P. James, of counsel), for plaintiffs.

Koonz McKenney Johnson & Regan, Washington, DC (Roger C. Johnson, of counsel), for plaintiff Kapar.

Bigham Englar Jones & Houston, James B. McQuillan, New York City, for defendants.

## MEMORANDUM AND ORDER

OWEN, District Judge.

In this case, involving a hijacking of a commercial airliner in 1984 with torture and two murders ensuing, defendant Middle East Airlines (MEA) moves for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. A jury trial of this remaining defendant was had in December of 1993. At the close of plaintiffs' case, MEA moved for judgment as a matter of law pursuant to Rule 50(a). The 50(a) motion was denied, and defendant then rested without presenting evidence, and the case was submitted to the jury. A mistrial was declared when the jury was unable to agree upon a verdict. Defendant subsequently renewed its motion for judgment as a matter of law, pursuant to Rule 50(b). While this is an anguishingly distressing case, after much thought I conclude that the record did not have a sufficient legal basis upon which a reasonable jury could have reached a verdict in favor of the plaintiffs against MEA. Its motion is accordingly granted.

This action flowed from the 1984 hijacking of Kuwait Airways flight 221 en route from Dubai, United Arab Emirates, to Karachi. Plaintiffs Charles Hegna, William Stanford, and Charles Kapar, Americans in our diplomatic service, were all passengers on the plane. The plaintiffs had started their travel on another Kuwait flight which originated in Kuwait City on December 3, 1984 and took them to Dubai. There they had to transfer to Kuwait 221 to continue to Karachi. In Dubai, they went through security leaving the transfer lounge, and another security check at the top of the boarding steps to the plane, and flight 221 took off for Karachi. The plane, however, was hijacked shortly after takeoff by four armed men who forced the pilot to fly to and land at Tehran, Iran. There the plane sat on a tarmac for six days with the hijackers in control. During that time the hijackers, apparently seeking and having identified the plaintiffs as Americans, used them in an escalating situation to endeavor to obtain the release of some political prisoners in Kuwait. They tortured Kapar and finally killed Hegna and Stanford. The hijacking was eventually ended by the Iranian authorities on December 10. Middle East Airlines was, among others, named as a defendant in this suit because it appears that the four hijackers got to the Kuwait flight from an MEA flight originating in Beirut, Lebanon with tickets from Beirut to Bangkok, via Dubai.

Defendant MEA contends that it is entitled to judgment as a matter of law because on the record at trial, there was insufficient evidence for the jury to find that defendant owed plaintiffs on a subsequent Kuwait flight any duty. Moreover, defendant argues that even if some duty were owed, there was insufficient evidence showing that defendants breached the duty or that such breach was the proximate cause of the tragedy. At trial, plaintiffs sought to establish that defendant owed them a duty of due care to avoid the risk of carrying potential hijackers and their weaponry to a subsequent targeted airline with resulting injury. Since plaintiffs were not passengers on any MEA flight, the evidence they presented as to MEA focused on two things: first, whether the tickets presented in Beirut should have caused MEA's ticket takers to be suspicious and alert the army which was responsible for passenger and baggage screening; and second, whether MEA should itself have conducted "secondary screening", that is, its own screening of passengers before boarding where by all accounts the army screening was "inadequate".

Plaintiffs argue that the following should have made the Beirut MEA ticket-takers suspicious of the four said passengers requiring some action:[1] their tickets were issued on Avianca stock, although they were not flying Avianca; the tickets included a Kuwait Airline connection, while the other Karachi-bound passengers on the MEA flight would normally connect to Pakistani International Airlines; and, the final destination listed on the tickets was Bangkok, a long way from Beirut, but they did not check any luggage, having only hand luggage.[2] But, under the circumstances, these were not that unusual. Indeed, plaintiffs' own aviation security expert, Charles Carrington, testified that a ticket agent noticing a trip from Beirut to Bangkok with no checked luggage *might* take a closer look at the ticket, but would probably be looking for signs of fraud: "The

ticket agent at Beirut, I would think that the ticket agent would take a second look at the ticket, at least, because it is odd and if not even for potential terrorists on board, for potential fraud; fraudulent ticket." On the issue of fraud, Carrington testified: "It is a valid ticket, apparently. There is nothing that indicates that it isn't."

Similarly, plaintiffs failed to present evidence sufficient for a jury to find that MEA had a duty to conduct secondary screening, or even could have. Screening of passengers before boarding at Beirut was conducted by police under the control of the Lebanese army which controlled the airport itself. Plaintiffs' expert Carrington defined secondary screening as an "air carrier perform[ing] its own screening of passengers and carry-on luggage after the official or government screening has been conducted." Beirut, was at that time, notorious for poor security.[3] While Carrington testified that secondary screening procedures were in place at Cairo and Istanbul, also with poor security, he also testified that he had not visited the Beirut airport and did not know, apart from depositions read into the record, what the relationship was between MEA's security duties and those of the Lebanese army. Those depositions were from Sami Boueri, MEA Assistant Vice President for Traffic Services, and Adel Hout, MEA Assistant Vice President Beirut Station. Their testimony was that security screening and carry-on luggage searching was conducted by the army at Beirut. Boueri stated that MEA was not allowed to have secondary screening security personnel, characterizing security as the "sole responsibility" of government authorities. I, accordingly, conclude that since plaintiffs failed to adduce sufficient proof that MEA *could* have conducted secondary screening, plaintiffs therefore necessarily failed to present sufficient evidence to permit a jury to conclude that it *should* have done so.

1. On the trial record, the jury did have sufficient evidence to conclude that the four men who ultimately turned out to be the hijackers of Kuwait 221 were flown to Dubai on MEA's plane.

2. There were, however, other passengers on the said MEA flight without checked luggage.

3. The terrorist organization Hezbollah had its headquarters in Beirut, but plaintiffs conceded that MEA would be required to transport even a known terrorist if he didn't have a gun or explosives or otherwise appear to be a threat to the plane.

Other flaws in plaintiffs' theory of MEA's duty to them as passengers on Kuwait 221 appear when the issue of proximate cause is examined. Even assuming that MEA had a duty to another airline's passengers to conduct secondary screening, or, having examined a ticket or tickets and become suspicious, to alert the army to be especially thorough in its screening, and assuming further that defendant breached those duties, except for a "but for" argument, one could not reach the conclusion that such a breach was the proximate cause of the tragedy to plaintiffs aboard the later flight Kuwait 221. If the MEA ticket-takers had scrutinized the tickets presented, then, according to plaintiffs' own expert, they would have found those tickets, while unusual, to be validly-issued tickets. Going one step further, even if the ticket-takers had become suspicious and alerted the army, there is no evidence of what, if anything, the army would have done with the information, or what it would have found had it searched such passengers or hand luggage. Similarly, even if MEA had done secondary screening prior to boarding, there is no evidence as to what, if anything, would have been discovered, since on this record, the weaponry did not emerge until aboard Kuwait 221. On this record, it is entirely possible that the hijackers were supplied their guns and grenades at the Dubai airport from some other source. Plaintiffs' own witnesses testified that at the Dubai airport, arriving and departing passengers commingled in the transit lounge, thereafter passing through security from the departure lounge into busses on the tarmac to their planes.[4]

Finally, the failure of Dubai's security and Kuwait Airway's own secondary screening to detect the arms going aboard its flight 221 is an independent intervening act precluding a finding of proximate cause in this case. Testimony at trial indicated that the tarmac was dark and only lightly guarded, and a British dignitary was occupying a large part of the attention of airport security agents. Kuwait Airways did conduct its own secondary

screening of passengers at the top of the boarding steps to flight 221, but obviously failed to detect the guns, grenades and explosives brought on by the hijackers. Plaintiffs argue that since the negligence of Kuwait Airways was reasonably foreseeable by MEA, MEA is not absolved. I conclude, however, that under these circumstances MEA's responsibility for negligence, if any, did not carry beyond Kuwait's subsequent clear negligence. If any duty was owed by MEA to plaintiffs, Kuwait Airways' failure to detect the weapons coming on its own plane was an independent intervening act that severed MEA from the chain of causation. *See Aboujdid v. Singapore Airlines, Ltd.,* N.Y.L.J., Oct. 27, 1989, at 21 (N.Y.Sup.Ct. Oct. 21, 1989).

MEA's motion for judgment as a matter of law is accordingly granted and plaintiffs' amended complaints against MEA are dismissed with prejudice.

The foregoing is so ordered. Submit judgments accordingly.

---

4. Of course, while the hijackers may well have carried aboard the MEA flight the weapons and ammunition they ultimately used to hijack Kuwait flight 221, nevertheless, that *possibility* alone, inviting the jury to engage in speculation, does not satisfy the legal requirement of proximate cause.