**Lorraine STANFORD, Executrix of the Estate of William L. Stanford; Edwena R. Hegna, Executrix of the Estate of Charles F. Hegna; and Charles Kapar, Plaintiffs–Appellants,**

v.

**KUWAIT AIRWAYS CORPORATION; Pan American World Airways, Inc.; Northwest Airlines, Inc.; and International Air Transport Association, Defendants,**

**Middle East Airlines Airliban, S.A., Defendant–Appellee.**

**Nos. 1256, 1505 and 1506, Dockets 95–7784, 95–7787 and 95–7789.**

United States Court of Appeals, Second Circuit.

Argued March 11, 1996.

Decided July 16, 1996.

---

John P. James, Friedman, Biondi & James, New York City, for Plaintiffs–Appellants Charles Kapar, Lorraine Stanford, and Edwena Hegna.

Ralph P. Dupont, Durant, Nichols, Houston, Mitchell & Sheahan, P.C., Bridgeport, CT, for Plaintiffs–Appellants Lorraine Stanford and Edwena Hegna.

Roger Johnson, Koonz, McKenney, Johnson & Regan, Washington, DC (Katherine Shepard, Koonz, McKenney, Johnson & Regan, Washington, DC, of counsel), for Plaintiff–Appellant Charles Kapar.

James B. McQuillan, Bigham Englar Jones & Houston, New York City, for Defendant–Appellee.

Before: WALKER, McLAUGHLIN, and LEVAL, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Four terrorists boarded Middle Eastern Airlines ("MEA") flight 426 in Beirut, Lebanon. The flight ended in Dubai, United Arab Emirates where the four terrorists disembarked, and connected with Kuwait Airways flight KU221, bound for Karachi, Pakistan. Three American diplomats, William Stanford, Charles Hegna, and Charles Kapar were also on board KU221. Shortly after take-off from Dubai, the terrorists hijacked KU221, forcing the pilot to turn north. The plane landed in Tehran, Iran and sat on the airport tarmac for days while the terrorists tortured the three American diplomats, finally murdering Hegna and Stanford.

Plaintiffs, Charles Kapar and the estates of the two deceased diplomats, brought this suit alleging that MEA's negligence was a proximate cause of the injuries and deaths occurring aboard KU221. After a jury trial in the United States District Court for the Southern District of New York, (Richard Owen, *Judge*), the jury deadlocked, and the court declared a mistrial. MEA then filed a motion for judgment as a matter of law, arguing that MEA owed no duty to the three diplomats, and that MEA's actions (in Beirut) were not a proximate cause of the injuries and deaths aboard KU221 (in Tehran). The court granted MEA's motion.

Plaintiffs appeal, arguing that MEA owed them a duty to use due care to avoid the known risk of hijacking, MEA breached that duty by failing to screen passengers adequately in Beirut, and this breach was a

proximate cause of their injuries. We reverse and remand for a new trial.

## BACKGROUND

In the Fall of 1983, the Da'Wa, a group of Shiite extremists, was imprisoned in Kuwait for deadly attacks on the United States and French embassies in Beirut. A year later, the Shiite Muslim group Hezbollah, an Islamic terror organization based in Beirut, increased its violent opposition to the incarceration of the Da'Wa prisoners. With the first suicide car bombing of the American embassy in Beirut in 1983, Hezbollah embarked on large scale terrorist activities, kidnaping American journalists, diplomats and academics, and murdering scores of people in suicide car bombings. This Shiite Muslim terror group threatened continued attacks on Kuwaiti, French, and American citizens unless the Da'Wa prisoners were released.

In May, 1983, the International Air Transport Association ("IATA") held its 21st Security Advisory Committee meeting in Montreal, Canada to discuss security measures among member airlines.[1] At this meeting, IATA discussed new techniques terror groups were using to circumvent airport security measures to infiltrate an airport or airline.

The meeting discussed one particular method for terrorists to capitalize on the lax security at a "dirty" airport and board a plane bound for a more secure airport. Upon arrival at the more secure airport, the terrorists would transfer to a "target" airline and then hijack the target plane: "[T]he would be terrorist may well have travelled on the original Carrier without any intention of committing a terrorist act against that Carrier, but with the object of a transfer to another target Carrier." Minutes of the IATA 21st Security Advisory Committee Meeting, Montreal, May 4–5, 1983. IATA cautioned its members that "the only solution to this situation is to create circumstances where some degree of reliance can be placed on the security measures of other States." *Id.*

MEA, Kuwait Airways, and other members of IATA, participated in a program of "interline" ticketing, a reciprocal arrangement whereby a single ticket written by one airline for a flight on that airline will also accommodate the same passenger's flight on a second airline with the revenues to be allocated pro tanto between the airlines. Passengers need only one ticket and one baggage check to travel on both airlines.

An MEA official admitted that he knew, in December 1984, that the security measures at Beirut airport were minimal. Specifically, MEA knew that X-ray machines for checking passengers' luggage were not operating and that metal detectors were apparently functioning but "locked" and not in use. In addition, MEA was aware or, in the exercise of reasonable prudence, should have been aware that many airlines had ceased all operations out of Beirut because of the threats of violence coming from Islamic militants in Beirut.

MEA maintained, however, that it was helpless to offer additional security measures because airport security was under the sole control of the Lebanese army. An MEA official testified that the military conducted searches of passengers and luggage by hand, but did not employ any more sophisticated forms of security screening. He also testified that MEA never asked the Lebanese military to strengthen the security measures at the Beirut airport.

MEA's employees at the Beirut airport were responsible for selling and examining passengers' tickets, checking the information on the tickets against visas and passports, and receiving baggage from the passengers. These employees were the first line of defense between hijackers who slipped through the ludicrous security at Beirut Airport and innocent passengers aboard MEA and connecting flights. Nevertheless, they did not perform any other searches, known as "sec-

---

1. IATA, of which MEA is a member, is "a private organization of domestic and foreign air carriers engaged in scheduled international air transportation. One of IATA's major purposes set out in its Articles of Association is 'to provide means for collaboration among the air transport enterprises engaged directly or indirectly in international air transport services …' " *Stanford v. Kuwait Airways Corp.,* 648 F.Supp. 657, 658 n. 1 (S.D.N.Y. 1986) (citations omitted).

ondary screening," of passengers or their bags.

Also in place was a communications network within MEA, allowing MEA employees to relay information between its stations in Beirut and Dubai. There is no evidence, however, that MEA ever used this information network to contact its agents in Dubai to have them relay information to other IATA members about suspicious passengers; and its employees certainly did not do so in this case.

On December 2, 1984, in the eye of the political hurricane roaring through the Middle East, four Hezbollah hijackers purchased interline tickets for travel from Beirut to Bangkok, Thailand, via Dubai and Karachi. They began their journey by presenting their interline tickets to the MEA agents at the Beirut airport, where they boarded MEA flight 426 to Dubai.

The hijackers' tickets had a stench about them. They had been purchased on very short notice with cash, and the flight traced an outlandish route: the passengers were to fly on MEA from Beirut to Dubai, where they were then to connect with Kuwait Airways to Karachi, and from there continue on to Bangkok. This itinerary was bizarre because: (1) there were regularly scheduled direct flights between Beirut and Bangkok; (2) the four terrorists were the only passengers aboard MEA 426 to connect with a Kuwaiti airline—every other passenger aboard who happened to be travelling to Karachi connected in Dubai with a Pakistani International Airlines flight; and (3) there was another scheduled MEA flight from Beirut directly to Karachi on December 4th, a day after the hijackers' actual departure. If the hijackers had waited for this next flight, they would have avoided (a) the stop at Dubai, and (b) an unnecessary twenty-hour layover in Karachi while waiting for the same December 4th plane that would eventually take them to Bangkok. Still another suspicious feature of the journey was that the men were travelling one-way, a very long distance, without any checked baggage. None of this apparently raised the eyebrow of any MEA employee.

Upon arrival in Dubai, the hijackers alighted MEA flight 426 and headed for their target: Kuwait Airways flight KU221. KU221 had originated in Kuwait City, bound for Karachi with a fateful stop in Dubai. It carried William Stanford, Charles Hegna and Charles Kapar. The three were employed by the United States Department of State, Agency for International Development, and were en route from Kuwait City to their base of operations in Karachi. KU221 stopped in Dubai to refuel and to pick up additional passengers heading for Karachi. Passengers connecting to KU221 from other flights were required to take a bus on the tarmac to KU221 and climb a set of stairs to enter the jet through the forward door of the plane.

A Kuwait Airlines official placed a table at the top of the stairs leading to the forward door of flight KU221, where he checked connecting passengers' carry-on luggage as they boarded. One witness, Neil Beeston, testified that he saw three of the four hijackers standing on the tarmac near the unguarded—and not in use—rear stairs of the airplane during the boarding process. Other testimony established that the tarmac, in general, was poorly lit and not well guarded.

Once KU221 was airborne, and over the Gulf of Oman, two hijackers burst into the cockpit, pressed a grenade against the flight commander's neck and ordered him to fly the plane to Mehrabad Airport in Tehran. The flight crew complied, landing in Tehran in the early morning of December 4th.

The four hijackers were armed with pistols, explosives, and other weapons. They released the women and children passengers, but singled out Hegna, Stanford, Kapar and a fourth American, John Costa, and forced them into the first-class cabin. Over the next six days the hijackers murdered Hegna and Stanford and beat and tortured Kapar and Costa, using them as pawns to gain the release of the Da'Wa prisoners in Kuwait. Iranian commandos raided the aircraft on December 9th, rescued the remaining passengers, and captured the hijackers.

No one knows how the hijackers got their weapons on board flight KU221. There was no direct evidence that they had weapons in their possession on board MEA flight 426 or,

later, when they boarded flight KU221. On the other hand, there was also no evidence that the weapons were already on board flight KU221 when the hijackers boarded. Plaintiffs showed that no weapons were found when KU221 was routinely cleaned at Dubai, that no passengers disembarked while the plane waited for about an hour on the tarmac at Dubai, and that all panels in the plane remained undisturbed. In addition, there was evidence that it was a common practice in the Middle East to allow one passenger to check in for a number of other passengers, thus allowing armed passengers to avoid contact with airline officials.

Plaintiffs brought this action against MEA, IATA, Kuwait Airways, Pan American World Airways, and Northwest Airlines. The claims against Kuwait Airways, Pan Am, and Northwest have been dismissed.[2] The parties stipulated to the dismissal of claims against IATA.

The case against MEA went to trial but the jury was unable to reach a verdict. The court declared a mistrial. Later, MEA moved for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, and the court granted the motion. *Kapar v. Kuwait Airways Corp.*, 892 F.Supp. 95 (S.D.N.Y.1995). The court reasoned that: (1) there was insufficient evidence for the jury to conclude that MEA owed plaintiffs a duty of care to avoid the risk of hijacking on another airline; (2) MEA's inaction was not a proximate cause of any of the injuries; and (3) the failure of (a) security at the Dubai airport and (b) Kuwait Airways's secondary screening measures were independent intervening acts breaking the causal chain that might have linked MEA's actions to the injury and deaths aboard flight KU221.

Plaintiffs appeal arguing that: (1) MEA had a duty to use due care to avoid the risk of hijacking within the interline system; (2) there was sufficient evidence for a jury to conclude that the failure of MEA to use due

care was a proximate cause of the injuries; and (3) the foreseeable negligence of (a) the security officials at Dubai and (b) Kuwait Airways were not intervening acts breaking the causal link between MEA and the injuries and deaths.

We reverse and remand the proceedings to the district court for a new trial.

## DISCUSSION

### I. *Subject Matter Jurisdiction and Choice of Law*

This case rests on diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs are citizens of the state of Virginia, and defendant MEA is a corporation organized under the laws of Lebanon, with a principal place of business in New York.

■ The parties' briefs and arguments do not discuss choice of law principles. None of the parties claims the application of Virginia, New York, or Lebanese law. Rather, each seems to have assumed that generally accepted tort principles apply, indiscriminately citing federal and state cases from a variety of jurisdictions but not including Lebanese law. The parties do not suggest that there are any substantive differences in the law of tort liability of Virginia, New York, or Lebanon that would be outcome-determinative in this case. Consequently, we will apply familiar concepts of common law tort liability to determine the rights of the parties. *Cf. Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 n. 4 (2d Cir.1981) (parties' acquiescence in law to be applied), *cert. denied*, 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982).

### II. *Standard of Review*

■ We review a district court's grant of judgment as a matter of law *de novo*. *United States v. One Parcel of Property Located at 121 Allen Place, Hartford, Ct.*, 75 F.3d 118, 121 (2d Cir.1996). We will affirm

---

**2.** *Stanford v. Kuwait Airways Corp.*, 648 F.Supp. 657 (S.D.N.Y.1986) (case against Kuwait Airways dismissed for lack of subject matter jurisdiction under Warsaw Convention); *Stanford v. Kuwait Airways Corp.*, 648 F.Supp. 1158 (S.D.N.Y.1986) (summary judgment in favor of Northwest); *Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100 (D.C.Cir.1988) (cases against Kuwait Airways and Pan Am dismissed for lack of subject matter jurisdiction under Warsaw Convention); *Stanford v. Kuwait Airlines Corp.*, 705 F.Supp. 142 (S.D.N.Y.1989) (admiralty and diversity claims against Pan Am dismissed under Warsaw Convention).

the grant of such motion "[o]nly if there is 'such ... an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party].'" *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995) (quoting *Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992)), *cert. denied,* —— U.S. ——, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). We must therefore "'consider the evidence in the light most favorable to the party against whom the motion was made and ... give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *Id.* (quoting *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d·363, 367 (2d Cir.1988)).

## III. *Negligence*

### A. *Duty*

■ It is elementary that to find a party liable in negligence, there must have been a duty—a relationship between the two parties such that society imposes an obligation on one to protect the other from an unreasonable risk of harm. The question here is: did the circumstances in this case create a duty on the part of MEA to protect Kapar, Hegna, and Stanford? We think they did, and hold, as a matter of law, that MEA had a duty to protect the plaintiffs from unreasonable risk of foreseeable harm.

■ Duty is a relative concept. Whether an individual must protect another from the unreasonable risk of foreseeable harm depends on the nature of the risk and the particular level of knowledge of the alleged tortfeasor. Thus, "[t]he duty which one person may owe in a particular situation for the protection of another person is measured by the exigencies of the occasion." Stuart M. Speiser, et al., 2 *The American Law of Torts,* § 9:4, at 1011 (1985); *see Reese v. Philadelphia & Reading R.R. Co.,* 239 U.S. 463, 36 S.Ct. 134, 60 L.Ed. 384 (1915); *Railroad Co.· v. Jones,* 95 U.S. 439, 24 L.Ed. 506 (1877). The alleged tortfeasor "must exercise such attention ... of the circumstances ... [and] knowledge of other pertinent matters, intelligence, and judgment as a 'reasonable person' would have—and, such *superior* attention

... knowledge, intelligence, and judgment as the actor himself happens to possess." 2 *The American Law of Torts,* § 9:4, at 1012 (emphasis in original).

■ In determining whether a duty exists, a court should examine: (1) the relationship between the parties; and (2) the reasonable foreseeability of harm to the person injured. *See LaMontagne v. E.I. DuPont De Nemours & Co.,* 41 F.3d 846, 856 (2d Cir.1994) (relationship may confer duty); *Alflex Corp. v. Underwriters Lab., Inc.,* No. CV87–3344JGD, 1989 WL 164359, at *3 (C.D.Cal. March 21, 1989) (duty depends on foreseeability of danger), *aff'd,* 914 F.2d 261 (9th Cir.1990) (Table), *cert. denied,* 502 U.S. 812, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991); *Gilliam v. Contractors United, Inc.,* 648 N.E.2d 1236, 1238 (Ind.Ct.App.1995); ·*see generally* W. Page Keeton *et al., Prosser· and Keeton on the Law of Torts* § 53, at 356–59 (5th ed.1984).

#### 1. *Relationship between MEA · and the Victims*

Although the plaintiffs were not passengers on an MEA flight, it is too late in the day to suggest that contractual privity is a prerequisite to the existence of a duty. 65 C.J.S. *Negligence* § 4(7) (1966). Indeed, "[t]he duty of vigilance to prevent injury has its source in the law applicable to human relations rather than in a narrow conception of privity." 57A Am.Jur.2d *Negligence* § 93 (1989). Thus, even without contractual privity,

> [w]henever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

*Stagl v. Delta Airlines, Inc.,* 52 F.3d 463, 469 (2d Cir.1995) (quoting *Havas v. Victory Paper Stock Co.,* 49 N.Y.2d 381, 386, 426 N.Y.S.2d 233, 236, 402 N.E.2d 1136, 1138

(1980) (quoting *Heaven v. Prender,* 11 Q.B.D. 503, 509 (1883))).

Plaintiffs demonstrated that MEA joined an enterprise with interline airlines, including Kuwait Airways, to facilitate travel among the cooperating carriers. MEA's participation in interline arrangements with other IATA airlines was a lucrative venture. It expanded the reach of their routes, and facilitated inter-airline travel. Interline carriers shared the profits resulting from this cooperative endeavor.

In addition, based on evidence produced at trial, a jury could properly find that: as early as May, 1983, the Security Advisory Committee of IATA issued a warning that terrorists would board airlines at airports with poor security, and transfer to target airlines at other airports with tighter security. *See* Minutes of the IATA 21st Security Advisory Committee Meeting, Montreal, May 4–5, 1983. While it is unclear from the record to whom IATA issued the warning, MEA, as a member of IATA, knew or, in the exercise of reasonable care should have known, of the warning. In addition, MEA was fully aware of the poor security measures at the Beirut airport. MEA's Assistant Vice President at the Beirut station testified that he knew that the Lebanese military had, but did not use, metal detectors, that X-ray equipment was unavailable, and that security checks consisted only of personal searches over which MEA exercised no control.

IATA concluded that a critical way to protect passengers aboard target flights was to place increased reliance on security measures directed toward passengers upon their initial entry into the interline system. Thus, IATA implicitly recognized the principle that "[d]uty is largely grounded in the natural responsibilities of societal living and human relations, such as have the recognition of reasonable men...." *Kahalili v. Rosecliff Realty, Inc.,* 26 N.J. 595, 603, 141 A.2d 301, 305 (1958); 65 C.J.S. *Negligence* § 4(1) n. 6 (1966).

Accordingly, a jury could reasonably find that when MEA accepted interline passengers aboard its planes in Beirut, it knew or should have known that there was a danger that terrorists would try to board their air-line only to transfer later to a vulnerable, interline target airplane. MEA operated out of Beirut airport, amidst heightened political tensions, an ongoing terrorist campaign that posed continuing threats against American and Kuwaiti citizens and establishments, and lax airport security. In addition, MEA was armed with information regarding unique terrorist hijacking tactics. Accepting interline passengers, while perhaps not normally a function implicating the safety of third parties, became such a function under the perilous circumstances existent at that time in Beirut.

■ The duty to protect third parties "arises under circumstances where the party is in a position so that 'anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to ... [another].'" *Mozingo v. Pitt Cty. Memorial Hosp., Inc.,* 101 N.C.App. 578, 587, 400 S.E.2d 747 (1991) (citations omitted). If MEA, in the exercise of ordinary care, should have recognized that under these circumstances, knowing what it knew, there was an unreasonable risk of hijacking to passengers aboard its flight and other connecting flights, then the jury could find that MEA should have implemented secondary screening measures or warned other interline members of a possible threat of hijacking.

■ MEA argued that it could not put secondary screening measures in place because security was under the sole control of the Lebanese military. The district court concluded that plaintiffs failed to adduce proof that MEA could have conducted secondary screening procedures. This was an erroneous allocation of the burden of proof. It is not incumbent upon the plaintiff to disprove every possible defense to a negligence theory. If MEA's contention was that it had no duty because it was barred by the Lebanese military from instituting secondary screening procedures in Beirut, it was MEA's responsibility to prove this, not the plaintiffs' responsibility to disprove it. In any event, even if MEA's hands were tied by the Lebanese military, precluding secondary

screening measures, nothing prevented MEA officials in Beirut from contacting connecting airlines to warn them of the danger of hijacking.

### 2. The Reasonable Foreseeability of Harm to the Persons Injured

In determining the existence of a duty, a court may examine the reasonable foreseeability of harm to the party injured. MEA argues that this erroneously conflates the concepts of duty and foreseeability. What MEA fails to recognize, however, is that there are two concepts of foreseeability, the one specific, the other general. The first concerns the foreseeability of the specific injury the plaintiff suffered, and focuses on whether the defendant's actions are a proximate cause of the harm. The second, and the one at issue here, concerns the general foreseeable risk which is crucial to determining the existence of a duty and helps to limit its scope.

In the second, or risk-defining sense, Judge Cardozo early recognized, "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928); *see also Campbell v. Cunningham Natural Gas Corp.*, 164 Misc. 1, 298 N.Y.S. 200, 204 (Sup.Ct.1937) (existence of a duty depends on whether the risk to be guarded against is one which would normally be anticipated or foreseen); 65 C.J.S. *Negligence* §§ 4(1) & 4(3). Hence,

> [t]he duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader "zone of risk" that poses a general threat of harm to others.... The proximate causation element, on the other hand, is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.... *As to duty*, the proper inquiry for the reviewing appellate court is whether the defendant's conduct created a foreseeable zone of risk, *not* whether the defendant could foresee the specific injury that actually occurred.

*McCain v. Florida Power Corp.*, 593 So.2d 500, 502–04 (Fla.1992) (emphasis added).

There was evidence that MEA knew: (1) of the threatened attacks by Hezbollah terrorists; (2) that terrorists were boarding flights in dirty airports to infiltrate other airlines; (3) that the Beirut airport had extraordinarily poor security; and (4) that the four hijackers who boarded in Beirut had tickets which teemed with suspicion. A jury could reasonably find, under these circumstances, that if MEA did nothing, it would create a zone of risk that stretched at least as far as the innocent passengers aboard flights with which the four hijackers would eventually connect. It lay well within ordinary prudence for an airline to realize that persons at the dirty Beirut airport who purchased tickets on short notice with cash, checked no luggage for a flight from the Middle East to the Far East, and took a circuitous route aboard flights which (a) they did not have to take to reach their destination, (b) created inordinate delays and layovers, and (c) no other passenger aboard MEA flight 426 took, posed a hijacking threat.

In sum, the duty is dictated and measured by the exigencies of the situation, and the risk reasonably to be perceived defines the duty to be obeyed. 65 C.J.S. *Negligence* § 4(2). We conclude that MEA, as a first leg interline carrier, had a duty to protect passengers on other interline connecting flights from unreasonable risk of harm through the use of reasonable precautions in the face of reasonably foreseeable risks. MEA was faced with a set of circumstances that a jury could reasonably find created a foreseeable risk, necessitating some action to protect others from an unreasonable threat of hijacking.

### B. Breach

On the evidence presented a jury could reasonably find that MEA failed to take reasonable precautions in the face of foreseeable risks. This question should be left for the jury to decide on retrial.

### C. Proximate Cause

The district court held that plaintiffs failed to prove that MEA's inaction was a

proximate cause of the deaths of Hegna and Stanford, and the injuries sustained by Kapar. The court reasoned that: (1) there was no evidence of what the Lebanese military could have done if MEA had alerted them to the four suspicious men; (2) the evidence showed only that the weaponry emerged on board the Kuwait Airways plane, leaving open the possibility that the hijackers procured their weapons in Dubai; and (3) even if a causal link were established, the negligence of the Kuwait Airways employees and the Dubai airport security officials were intervening acts, breaking the chain of causation between MEA and the resultant harm.

We disagree with this analysis. Plaintiffs made at least a *prima facie* showing of causation, and this record does not present such an overwhelming amount of evidence that fair minded jurors "could not arrive at a verdict against [MEA]." *See LeBlanc–Sternberg,* 67 F.3d at 429. Considering the evidence in the light most favorable to plaintiffs, and resolving all inferences that a jury might draw in their favor, it cannot be said that no rational juror could find in plaintiffs' favor.

The district court concluded that plaintiffs failed to establish proximate cause, in part, because "there [was] no evidence of what, if anything, the army would have done" if alerted by the MEA ticket agents of the threat posed by the four hijackers. *Stanford,* 892 F.Supp. at 98. We disagree.

First, as a practical matter, warning the Lebanese military was not the only option open to MEA. Even assuming that the Lebanese military, after receiving a warning of the possible threat, would do nothing, plaintiffs contend that MEA could have warned the connecting airlines on which MEA knew the hijackers had reservations. Consequently, the fact that there was no evidence of what, if anything, the military would have done, is not determinative.

Second, the district court impermissibly substituted its judgment for that of the jury. We cannot say that the district court's doubts regarding the possible lack of concern of the Lebanese military amounts to such overwhelming evidence in favor of MEA that reasonable and fair-minded jurors would have to conclude that there was no causal link between MEA's inaction and the resultant injuries and deaths. *See LeBlanc–Sternberg,* 67 F.3d at 429.

The district court also noted that, even if MEA employees or the Lebanese military conducted a search, there was no evidence that they would have found the weapons used in the hijacking of KU221. The court concluded that it was possible that the hijackers did not get their weapons until they reached Dubai. Again, this is a case where reasonable minds can differ. The plaintiffs presented testimony and circumstantial evidence from which a reasonable person could infer that MEA's failure to act proximately caused Kapar's injuries and the deaths of Stanford and Hegna.

First, the plaintiffs offered the testimony of Neil Beeston, an engineer at Kuwait Airways and passenger aboard flight KU221, who witnessed three of the hijackers trying to use the unguarded rear stairs of the Kuwait Airways jet during the boarding process. Plaintiffs showed that it was common in the Middle East to allow one passenger to check in for several others, thus allowing armed cohorts to avoid detection. Also, the Kuwait Airways jet was cleaned at Dubai and no passengers were allowed to leave the aircraft. Furthermore, no passenger had access to any area of the plane, other than the toilets and overhead bins, where one could stash weapons. Plaintiffs showed that there was no evidence of tampering with any of the panels in the aircraft bathrooms. Finally, there was an IATA warning describing the modus operandi of some armed terrorists, who board airlines at dirty airports.

From this evidence a reasonable juror could conclude that the terrorists had the weapons in their possession at the very beginning of their journey in Beirut. One could reasonably conclude that the hijackers boarded the MEA flight armed (consistent with the modus operandi outlined in the IATA circular) and, once in Dubai, one "clean" hijacker checked in for the other three who attempted to bypass the Kuwait Airways official at the forward door by entering the rear stairwell. One could infer from

the facts that (1) the cleaning crew discovered nothing, (2) no one left the plane, and (3) the plane's panels were not disturbed, that the weapons were not already aboard KU221 when it arrived in Dubai.

Plaintiffs were not required to prove causation beyond a reasonable doubt. It was sufficient to present evidence "from which reasonable persons may conclude that it [was] more probable that [the hijacking] was caused by [MEA] than that it was not." *Prosser and Keeton*, § 41, at 269. While reasonable minds could differ on this evidence, there is not such a dearth of proof on the issue of causation as to justify taking the matter away from the jury.

Finally, the district court concluded that plaintiffs failed to establish a proximate link between MEA and the injuries and deaths aboard flight KU221, because the negligence of the security officials and of the Kuwait Airways employees in Dubai were independent intervening acts breaking the causative chain. *Stanford*, 892 F.Supp. at 98. Again, we must disagree.

 The causative link is not broken by the negligent conduct of a third person when such conduct is normal or foreseeable under the circumstances. *See Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 58 (2d Cir.1992) (applying Vermont law); *Mull v. Ford Motor Co.*, 368 F.2d 713, 717 (2d Cir. 1966) (applying New York law). The crucial aspect of this inquiry is a determination of "how far the first wrongdoer should be charged with forecasting the future results of his conduct." *Slattery v. Marra Bros., Inc.*, 186 F.2d 134, 136 (2d Cir.) (applying New Jersey law), *cert. denied*, 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351 (1951). "Neither the precise hazard nor the exact consequences [of the third party's negligent act] need be foreseen." *Mull*, 368 F.2d at 717. Questions regarding what is normal or foreseeable, like other questions of proximate cause, are generally issues for the trier of fact. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 555–56 (2d Cir.1987).

Here, the evidence at trial, bathed in a light most favorable to plaintiffs, was sufficient to carry to the jury the issue of foreseeability of third party negligence. There was

evidence that the airport at Dubai had poor tarmac security. Also, MEA had notice, from the IATA warning issued in May, 1983, that there were differing standards of security in airports across the Middle East, and that even those airports engaging in security measures were potentially lax due to the "delays in facilitation and escalating security costs ... [and the difficulty in meeting] the manning requirements for sufficient, trained personnel to operate a gate search system." Minutes of the IATA 21st Security Advisory Committee Meeting, Montreal, May 4–5, 1983.

Although it is arguable whether it was "foreseeable" that security measures would be insufficient in Dubai to respond to the heightened threat, such matters are properly left to the trier of fact. There was enough evidence to allow the jury to decide whether the actions of the Kuwait Airways employees and security officials in Dubai were "closely and reasonably associated with the immediate consequences of the defendant's act, and form a normal part of its aftermath...." *Prosser & Keeton* § 44, at 307. Just as a tortfeasor who negligently breaks a victim's leg must reasonably anticipate negligence on the part of the doctor setting that leg, so too an airline which does nothing to prevent potential hijackers from travelling aboard its aircraft may reasonably have to anticipate that other airlines will be lax in their security measures.

## CONCLUSION

We recognize, as the district court did, that this is an "anguishingly distressing case." *Stanford*, 892 F.Supp. at 96. And we concede it is a close call. We conclude, however, that MEA was not so far removed from the actions aboard the ill-fated Kuwait Airways flight as to be entitled to judgment as a matter of law. MEA took on responsibilities in the clouded atmosphere of threatened terrorist attacks, with knowledge of terrorist hijacking tactics. With this awareness and knowledge it had a commensurate duty to protect those within a foreseeable scope of danger. Accordingly, we reverse the district

court's grant of MEA's Rule 50(b) motion, and remand the case for a new trial.