In re SEPTEMBER 11 LITIGATION

**World Trade Center Properties LLC et al., Plaintiffs,**

v.

**American Airlines, Inc. et al., Defendants.**

**Nos. 21 MC 101(AKH), 08 Civ. 3722(AKH).**

United States District Court, S.D. New York.

Nov. 21, 2012.

Richard Arthur Williamson, Alexander Fellows Powell, Thomas A. Egan, Flemming Zulack Williamson Zauderer LLP, New York, NY, Gregg Herbert Kanter, Gregg H. Kanter Law Office LLC, Philadelphia, PA, for Plaintiffs.

Desmond Thomas Barry, Jr., Condon and Forsyth LLP, Loretta Anne Redmond, Quirk and Bakalor, P.C., New York, NY, Eric Scott Lent, Perkins Coie LLP, Seattle, WA, for Defendants.

*ORDER AND OPINION GRANTING UNITED'S MOTION FOR SUMMARY JUDGMENT THAT IT HAD NO DUTY FOR FLIGHT 11*

ALVIN K. HELLERSTEIN, District Judge.

## I. INTRODUCTION

On September 11, 2001, terrorists hijacked American Airlines Flight 11 ("Flight 11") and crashed it into 1 World Trade Center, the northern Twin Tower. As 1 World Trade Center collapsed, it spewed debris, some of which pierced the facade of 7 World Trade Center ("Tower 7"), causing fires and, eventually, Tower 7's collapse.[1]

7 World Trade Company, L.P. ("7WTCo."), lessee of Tower 7, sued United Airlines, American Airlines and others (collectively, "Aviation Defendants"), alleging that Tower 7 would not have been destroyed but for Aviation Defendants' negligence. Aviation Defendants have moved for summary judgment on the basis that 7WTCo.'s insurance recovery has fully compensated 7WTCo. for any possible tort recovery against Aviation Defendants.

Independent of that motion, two Aviation Defendants, United Continental Holdings, Inc. and United Airlines, Inc. (together, "United"), move for summary judgment on the basis that they bear no responsibility for Tower 7's destruction because they bear no responsibility for Flight 11 or its hijacking. For the reasons stated below, United's motion is granted.

## II. FACTUAL BACKGROUND

On September 11, Portland International Jetport ("PWM") in Portland, Maine, had a single security screening checkpoint that screened all departing passengers, regardless of air carrier. "Th[e] checkpoint was under the custodial responsibility of Delta Air[ Lines, which contracted for security screening services with Globe Aviation Services." The National Commission on Terrorist Attacks Upon the United States, Staff Report on the Four Flights and Civil Aviation Security 3 (September 12, 2005) ("Staff Report"). On August 9, 2001, the air carriers participating in security screening at PWM, including United, executed a "Shared Responsibility Agreement," pursuant to which Delta Air Lines assumed responsibility "for the overall operation of the passenger security screening checkpoint ... for the purpose of avoiding a multiplicity of civil penalty actions, as well as to allocate the administrative and financial responsibility for any civil penalties levied by the Federal Aviation Administration." Delta Air Lines also assumed

---

1. For a detailed account of Tower 7's collapse, see *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 865 F.Supp.2d 370 (S.D.N.Y.2011), appeal docketed, No. 11–4403 (2d Cir. Aug. 4, 2010).

responsibility for "any alleged non-specific violation of the Air Carrier Standard Security Program ('ACSSP') occurring at the passenger security screening checkpoint," while "[e]ach air carrier remained] solely responsible for any civil penalties levied against it individually resulting from violations of that air carrier's ACSSP or resulting from any alleged specific violation of the ACSSP." [2]

In the early the morning of September 11, Mohamed Atta and Abdul Aziz al Omani arrived at PWM, planning to take Colgan Air Flight 5930 ("Flight 5930") to Boston's Logan International Airport ("Logan"), where they planned to board Flight 11, bound for Los Angeles International Airport. At 5:43 a.m., they received their Flight 5930 boarding passes at the U.S. Airways ticket counter in the unsecure area of the PWM terminal.[3] At 5:45 a.m., Atta and Omani entered the security screening checkpoint to access the secure area of the PWM terminal, They passed through the checkpoint and proceeded to Gate 11, where they boarded Flight 5930 for its on-time 6:00 a.m. departure. United bore no responsibility for Flight 5930's ticketing, passenger check-in and boarding, or for the operation of the flight itself.

Flight 5930 arrived at Gate B9(A) in Pier B of Terminal B at Logan at approximately 6:45 a.m. American Airlines Flight 11 was scheduled to depart at 7:45 a.m. from Gate 32 in Pier A of Terminal B. Piers A and B were separated by the Terminal B Parking Garage. Traveling from Gate B9(A) to Gate 32 required exiting both the secure and unsecure areas of Pier B, crossing the Terminal B Parking Garage, entering the unsecure area of Pier A, passing through a security screening checkpoint to enter the secure area of Pier A, and, finally, proceeding to Gate 32. *See* Staff Report at 3, 5.

Upon exiting Flight 5930, Atta and Omari followed this route to the unsecure area of Pier A. After obtaining their Flight 11 boarding passes from American Airlines, Atta and Omani entered a security screening checkpoint to access the secure area of Pier A. There were two such security screening checkpoints providing access to the secure area of Pier A, both operated by Globe Aviation Services under a contract with American Airlines. Staff Report 5; The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States 2 (2004) ("9/11 Commission Report"). United had no responsibility for either checkpoint; United's checkpoint and gates were in Terminal C of Logan Airport, a substantial distance removed from the American checkpoints and gates. Staff Report at 18. Atta and Omari each passed through one of these checkpoints before boarding Flight 11,[4] The other Flight 11

---

**2.** An air carrier is required to create, and secure Federal Aviation Administration approval of, such a security program pursuant to 14 CFR § 108.5. *See generally In re Sept. 11 Litig.,* 811 F.Supp.2d 883, 888–89 (S.D.N.Y.2011), The Shared Responsibility Agreement defines non-specific violations as "those which cannot be traced to a particular air carrier, such as failure to detect an FAA approved test object; failure to wear a dosimeter; failure to maintain current training, employee background, and re-verification records," and specific violations as "those which can be traced to a particular air carrier or its passengers."

**3.** The Flight 5930 boarding passes were issued at the U.S. Airways ticket counter because Colgan Air was a U.S. Airways carrier. Atta and Omani were informed that they would need to obtain their Flight 11 boarding passes at Logan. Atta checked two bags on Flight 5930. However, at Logan those bags were not loaded onto Flight 11 in time for its departure.

**4.** The security screening each received at a Logan checkpoint was in no way impacted by the earlier PWM security screening.

hijackers, Wail al Shehri, Waleed al Shehri and Satam al Suqami, arrived at Logan via automobile and each passed through one of the same two checkpoints before boarding Flight 11.[5] Flight 11 pushed back from the gate at 7;40 a.m. and by 8:00 a.m. was airborne.

At approximately 8:15 a.m., the hijackers began their takeover of the aircraft. At 8:46 a.m., Flight 11 crashed into the upper stories of I World Trade Center. The 110–story structure collapsed at 10:28 a.m., spewing flaming debris as it fell. The debris, expelled to the north, pierced the facade of Tower 7, starting fires inside the building. The fires burned unchecked, and at 5:21 p.m., Tower 7 collapsed.

## III. Law

### a. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir.2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.2004).

### b. Choice of Law

■■■ 7WTCo brought this action pursuant to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 note et seq. ("ATSSSA"), which creates a federal cause of action for damages arising from the terrorist-related aircraft crashes of September 11. ATSSSA provides the United States District Court for the Southern District of New York with original and exclusive jurisdiction over such actions, with the substantive law to be "derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Under New York choice of law rules, the state in which a tort occurred has the strongest interest in applying its conduct-regulating rules. *See Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). As neither party has shown New York law to be inconsistent with or preempted by federal law, New York law governs the issue of duty with respect to the crash of Flight 11 and the destruction of Tower 7. *See In re Sept. 11 Litig.*, 280 F.Supp.2d 279, 289–90 (S.D.N.Y.2003).

### c. Duty

■■■ "To establish a prima facie case of negligence under New York law, 'a

---

**5.** "Because [Logan's] security checkpoints and to area were not monitored by video surveillance equipment at that time, no conclusive evidence exists regarding when and how the Flight 11 hijackers passed through checkpoint screening. To reach their departure gate after checking in, all five hijackers would have been required to pass through one of two checkpoints, both of which were operated by Globe Aviation Services under a contract with American Airlines. The smaller checkpoint opened at 7:15 a.m. and was used mainly for overflow traffic from the other. We believe it is most likely that the hijackers would have chosen to pass through the busier checkpoint in the hopes of being less conspicuous." Staff Report 5 (footnote omitted).

plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon ex rel. Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985)). "The existence of a duty is thus a sine qua non of a negligence claim: In the absence of a duty, as a matter of law, no liability can ensue." *Alfaro v. Wal–Mart Stores, Inc.,* 210 F.3d 111, 114 (2d Cir.2000) (internal quotation marks omitted); *Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 402, 492 N.Y.S.2d 555, 482 N.E.2d 34 (1985); *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 341, 162 N.E. 99 (1928).

"[T]he existence of a duty is an issue of law for the courts," while "whether a particular defendant owes a duty to a particular plaintiff is a question of fact." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996); *Alfaro,* 210 F.3d at 114. In determining the existence of a duty, "not only logic and science, but policy play an important role. The common law of torts is, at its foundation, a means of apportioning risks and allocating the burden of loss. While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that the legal consequences of wrongs are limited to a controllable degree." *Waters v. New York City Hous. Auth.,* 69 N.Y.2d 225, 229, 513 N.Y.S.2d 356, 505 N.E.2d 922 (1987) (citations and internal quotation marks omitted). "Identifying the scope of an alleged tortfeasor's duty is not something derived or discerned from an algebraic formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility. New York courts fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *Alfaro,* 210 F.3d at 114 (citations and internal quotation marks omitted). The New York Court of Appeals has expressed concern regarding "the unfairness of imposing liability for the acts of another" and the "potentially limitless liability" that may result.

> We have been cautious ... in extending liability to defendants for their failure to control the conduct of others. A defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control. This judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another. A duty may arise, however, where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers. The key in each is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm. In addition, the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship.

*Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232–33, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) (citations and internal quotation marks omitted).

## IV. ANALYSIS

The basis of 7WTCo.'s negligence claim against United is 7WTCo.'s contention that "United had a legal duty and a clear chance to prevent the hijacking of American Airlines Flight 11 when Atta and his accomplice passed through the Portland security checkpoint for which United had shared responsibility."

 I begin with "[t]he threshold question in any negligence action," namely "does defendant owe a legally recognized duty of care to plaintiff?" *Hamilton*, 96 N.Y.2d at 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055. In the present case, the question is whether United owed 7WTCo. a duty of care. 7WTCo. contends that United had such a duty, relying on *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir.1996).

In *Stanford*, four Hezbollah terrorists, on December 3, 1984, boarded Middle East Airlines ("MEA") Flight 426 ("Flight 426") in Beirut, Lebanon, bound for Dubai, United Arab Emirates, Arriving in Dubai, the terrorists boarded Kuwait Airways Flight 221 ("Flight 221"), bound for Karachi, Pakistan. Among the passengers on Flight 221 were three United States diplomats. After takeoff, the terrorists hijacked the aircraft and forced the pilot to fly to Tehran, Iran. Once the aircraft reached Tehran, the terrorists held the diplomats and an additional American passenger hostage, tortured all four, and murdered two of the diplomats.

The surviving diplomat and the estates of the two deceased diplomats sued MEA, alleging that the injuries and deaths would not have occurred but for MEA's negligence. The trial court found that MEA owed no duty to the diplomats and granted MEA judgment as a matter of law. *Stan-*

*ford v. Kuwait Airways Corp.*, 892 F.Supp. 95 (S.D.N.Y.1995). Upon the plaintiffs' appeal, the Second Circuit concluded that while it was a "close call," "MEA was not so far removed from the actions aboard the ill-fated Kuwait Airways flight as to be entitled to judgment as a matter of law," and reversed the trial court's decision. *Stanford*, 89 F.3d at 127–28. *Stanford's* unique facts, however, distinguish it from the present case.

Other than sharing residual authority for the PWM security screening checkpoint, United had no connection to Flight 11 or its hijackers. In *Stanford*, MEA's connection to the hijackers was direct and significant. Beyond MEA's operation of Flight 426, "MEA's employees at the Beirut airport were responsible for selling and examining passengers' tickets, checking the information on the tickets against visas and passports, and receiving baggage from the passengers. These employees were the first line of defense between hijackers. and innocent passengers aboard MEA and connecting flights." *Id.* at 120. MEA's ticketing role is especially significant:

> The hijackers' tickets had a stench about them. They had been purchased on very short notice with cash, and the flight traced an outlandish route: the passengers were to fly on MEA from Beirut to Dubai, where they were then to connect with Kuwait Airways to Karachi, and from there continue on to Bangkok. This itinerary was bizarre because: (1) there were regularly scheduled direct flights between Beirut and Bangkok; (2) the four terrorists were the only passengers aboard MEA 426 to connect with a Kuwaiti airline—every other passenger aboard who happened to be travelling to Karachi connected in Dubai with a Pakistani International Airlines flight; and (3) there was another scheduled MEA flight from Beirut directly to Karachi on December 4th, a

day after the hijackers' actual departure. If the hijackers had waited for this next flight, they would have avoided (a) the stop at Dubai, and (b) an unnecessary twenty-hour layover in Karachi while waiting for the same December 4th plane that would eventually take them to Bangkok. Still another suspicious feature of the journey was that the men were travelling one-way, a very long distance, without any checked baggage. None of this apparently raised the eyebrow of any MEA employee. *Id.* at 121.

Furthermore, "MEA, Kuwait Airways, and other [airlines] participated in a program of 'interline' ticketing, a reciprocal arrangement whereby a single ticket written by one airline for a flight on that airline [would] also accommodate the same passenger's flight on a second airline with the revenues to be allocated pro tanto between the airlines. Because of interline ticketing, MEA in fact issued the hijackers their tickets to the flight that they hijacked.

Also, MEA knew that the poor security at the Beirut airport could lead hijackers to board a flight at Beirut intending to hijack a connecting flight at a second airport. MEA "knew or, in the exercise of reasonable care should have known" of a warning issued in 1983 by the Security Advisory Committee of the International Air Transport Association, of which MEA was a member, that "terrorists would board airlines at airports with poor security, and transfer to target airlines at other airports with tighter security." *Id.* at 120, 124. Even fully crediting 7WTCo.'s allegations, however, the circumstances in the present case are not analogous.

As the Second Circuit put it, *Stanford* was a "close call," at the outer limits of notions of duty. Its facts are plainly distinguishable from the present case and it does not persuade me that a defendant situated like United owes a duty of care to a plaintiff situated like 7WTCo.

In deciding whether such a duty of care should be found, I must heed the New York Court of Appeals' caution regarding the extension of liability to defendants for their failure to control the conduct of others in light of the potential for unfairness and potentially limitless liability. *Hamilton*, 96 N.Y.2d at 232–33, 727 N.Y.S.2d 7, 750 N.E.2d 1055. As Chief Judge Cardozo famously wrote, "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf*, 248 N.Y. at 344, 162 N.E. 99. It was not within United's range of apprehension that terrorists would slip through the PWM security screening checkpoint, fly to Logan, proceed through another air carrier's security screening and board that air carrier's flight, hijack the flight and crash it into 1 World Trade Center, let alone that 1 World Trade Center would therefore collapse and cause Tower 7 to collapse.

For these reasons, I rule that United did not owe 7WTCo. a duty of care.

## V. CONCLUSION

For the reasons discussed above, United's motion for summary judgment is granted. The Clerk shall mark the motion (Doc. No. 187) terminated and enter judgment dismissing Defendants United Continental Holdings, Inc. and United Airlines, Inc, from the case. Costs shall be taxed by the Clerk.

SO ORDERED.