*260
 
 OPINION OF THE COURT
 

 Smith, J.
 

 The primary issue on this appeal is whether the relationship between the parties was sufficient to render defendant liable to plaintiffs for the tort of negligent misrepresentation. We affirm the order of the Appellate Division because the record supports the finding that a special relationship existed between the parties which under the circumstances here required defendant to speak with care.
 

 Plaintiffs invested $320,000 each in a limited partnership called Cogenic Embarcadero L/P. This partnership involved one of several projects developed by Cogenic Energy Systems, Inc. (CESI) for the purpose of providing heat and electricity to industrial and commercial energy users through on-site gas-powered "cogeneration” units. The incentive for employing co-generation to meet energy needs stemmed from the lower cost of self-generated energy as compared to the rates charged by utility companies for supplying the equivalent units of power. In return for providing and installing the cogeneration units, CESI shared a portion of the energy cost savings realized by the participating facilities.
 

 The Embarcadero project supplied electricity and heat to the Holiday Inn in the San Diego area of California. In late 1987, CESI began seeking new buyers for the Embarcadero project. In furtherance of the renewed sales effort, CESI’s president requested an updated "feasibility study” from the San Diego office of the company so that prospective buyers could evaluate the viability of the project on more current financial information. In November 1987, CESI generated projections on the Embarcadero project. The projections assumed that electric and gas rates in 1988 would remain at 1987 levels despite a pending application by the local utility for a rate change which, if approved, would eliminate any return on the investment.
 

 Defendant, a lawyer, certified public accountant and former chief financial officer of Pepsico for 26 years became involved with CESI in 1985 after he retired from Pepsico. Defendant had been recruited to serve on CESFs board because the company believed that his reputation would enhance its credibility with potential investors. In the fall of 1987, CESFs president asked defendant if he knew of anyone who would be
 
 interested
 
 in buying or investing in the Embarcadero project. At that time, defendant was the chairman of CESFs board. In December 1987, defendant also became CESFs chief financial
 
 *261
 
 officer. Defendant became the contact person at CESI for the Embarcadero project and he began seeking investors for the limited partnership.
 

 As part of his efforts to market the Embarcadero project, defendant asked his accountant, Michael Gross, if he knew of anyone who would be interested in the investment. Gross separately approached plaintiffs about the Embarcadero project and provided them with the November 1987 projections which he had obtained from the defendant.
 

 In mid-December, defendant met with plaintiff Katzenbach at Marine Midland Bank in order to discuss financing for plaintiff’s potential investment in the Embarcadero project. During this meeting, defendant told Katzenbach that the Embarcadero project was a good investment and that he should look at the numbers provided in the projections. After the meeting at Marine Midland, defendant learned that plaintiff Kimmell was also considering investing in the Embarcadero project.
 

 Defendant’s efforts to solicit investors occurred in a climate which was rapidly becoming unfavorable for the San Diego co-generation industry. After widely publicized hearings on proposed utility rate changes, a settlement was reached and on December 22, 1987, the California Public Utilities Commission approved a new rate structure. Effective January 1, 1988, the new rates rendered any cost savings from cogeneration in the San Diego area minimal at best and doomed any investment in the Embarcadero project to failure.
 

 In early January 1988, based on the revenues received from the Embarcadero project in November and December 1987, a new set of projections predicting an even higher rate of return from the project was issued at defendant’s behest. The new projections estimated a 10% increase in energy savings over the November 1987 projections. Defendant sent the revised projections to Gross with a cover memo which stated, in relevant part, "[a]fter a thorough discussion with our West Coast administrator to assure ourselves that the first two months are not an aberration, it is reasonable to assume that we are and will exceed our original projection, done sometime ago, by at least 10%.” Defendant intended the memo and the revised projections, dated January 6, 1988, to reach plaintiffs and assumed that Gross would deliver the documents to them. Plaintiffs received and reviewed the revised projections.
 

 Unfortunately, defendant and the revised projections failed to account for the recent and substantial change in local util
 
 *262
 
 ity rates. Since the January 6, 1988 projections were not based on the current and actual utility rates in effect, they misrepresented the potential rate of return ori the Embarcadero project. As of January 1, 1988, the Embarcadero project was unlikely to generate any returns for its investors.
 

 On January 8, 1988, defendant, who did not know of the widely publicized April 1987 application for a change, in utility rates, or the devastating nature of the rate change which went into effect on January 1, met with Kimmell and told him that the Embarcadero project was a good investment with earnings better than anticipated. Defendant also sent a letter to Kimmell, dated January 8, 1988, stating, "If you have any questions [about the Embarcadero project] please give me a call as I am confident I can give you 'hot comfort’ on this one.”
 

 Defendant’s efforts at soliciting plaintiffs’ participation in the limited partnership were successful. After the meeting at Marine Midland in mid-December 1987, plaintiff Katzenbach decided to take a half interest in the Embarcadero project for $320,000. Katzenbach signed the limited partnership agreement in March 1988. Kimmell made his investment decision shortly after his January 8 meeting with the defendant. He also invested $320,000 in the project. Defendant and Gross received a commission of $40,000 for bringing plaintiffs to the Embarcadero project which they split evenly between them. The $640,000 obtained from plaintiffs represented approximately one third of CESI’s total revenues for the fiscal year ending January 1, 1988. CESI, which had a negative net worth of $3.4 million on January 31, 1988, subsequently filed for bankruptcy in 1989, and was later liquidated.
 

 Plaintiffs commenced this action seeking damages arising out of their failed investment in the Embarcadero project. After a nonjury trial, Supreme Court found that defendant had negligently misrepresented, both directly and by encouraging plaintiffs to rely on the projections generated by CESI, that the Embarcadero project would earn income, and that plaintiffs relied on this misrepresentation to their detriment. Supreme Court also found the existence of a special relationship sufficiently resembling privity to justify holding defendant liable for negligent misrepresentation. The Appellate Division affirmed Supreme Court’s findings of fact, determined that there was ample support for the trial court’s conclusions and held that defendant was liable for negligent misrepresentation. We granted defendant leave to appeal.
 

 
 *263
 
 Defendant contends that he was not in privity or in a relationship sufficiently resembling privity with plaintiffs to render him liable for negligent misrepresentation. Defendant also argues that he did not owe plaintiffs a duty to speak with care. In the alternative, defendant contends that he cannot be held liable for negligent misrepresentation because the Business Corporation Law provides that corporate officers and directors may rely on "information, opinions, reports or statements” of corporate employees
 
 (see,
 
 Business Corporation Law § 715 [h]; §717 [a]).
 

 Liability for negligence may result only from the breach of a duty running between a tortfeasor and the injured party. Although the existence of a duty is an issue of law for the courts
 
 (see, Eiseman v State of New York,
 
 70 NY2d 175, 187), once the nature of the duty has been determined as a matter of law, whether a particular defendant owes a duty to a particular plaintiff is a question of fact. We turn first to the nature of the duty which may give rise to liability for negligent misrepresentation.
 

 In the commercial context, a duty to speak with care exists when "the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information”
 
 (International Prods. Co. v Erie R. R. Co., 244
 
 NY 331, 338). This reliance must be justifiable, as a "casual response given informally does not stand on the same legal footing as a deliberate representation for purposes of determining whether an action in negligence has been established”
 
 (Heard v City of New York,
 
 82 NY2d 66, 74-75).
 

 Since a vast majority of commercial transactions are comprised of such "casual” statements and contacts, we have recognized that not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care
 
 (see, International Prods. Co., supra,
 
 at 338). Rather, liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified. Professionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients, and in certain situations we have imposed liability for negligent misrepresentation when they have failed to speak with care
 
 (see, e.g., Ossining Union Free School Dist. v Anderson
 
 
 *264
 

 LaRocca Anderson, 73
 
 NY2d 417 [engineering consultants];
 
 White v Guarente,
 
 43 NY2d 356 [accountants];
 
 Ultramares Corp. v Touche,
 
 255 NY 170 [accountants];
 
 Glanzer v Shepard,
 
 233 NY 236 [public weighers]).
 

 The analysis in a commercial case such as this one is necessarily different from those cases because of the absence of obligations arising from the speaker’s professional status. In order to impose tort liability here, there must be some identifiable source of a special duty of care. The existence of such a special relationship may give rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech.
 

 Whether the nature and caliber of the relationship between the parties is such that the injured party’s reliance on a negligent misrepresentation is justified generally raises an issue of fact. In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose. The record here contains ample support for the finding that defendant’s relationship with plaintiffs gave rise to a duty to speak with care.
 

 As CESI’s chief financial officer and chairman, defendant was uniquely situated to evaluate the economics of the Embarcadero project in December 1987 and January 1988. Moreover, as the general partner of Cogeneration Partners, a limited partnership involving six CESI cogeneration installations, defendant was experienced with the sale of CESI projects to investors through the limited partnership form and the business aspects of cogeneration. Plaintiffs, who knew of defendant’s involvement with Cogeneration Projects, justifiably assumed that defendant possessed expertise in this area and relied on his apparently unique knowledge of CESI and its operations.
 

 Defendant’s efforts sought to induce plaintiffs to invest in the project. The record indicates that the Embarcadero projections were generated for the express purpose of providing investors with current information about potential returns on the
 
 project.
 
 As the CESI representative responsible for marketing the Embarcadero limited partnership, defendant provided Gross with projections to distribute to potential investors gen
 
 *265
 
 erally, and to plaintiffs in particular. Defendant testified at trial that he expected plaintiffs to rely on these projections. Defendant also met with each plaintiff, and personally represented that the Embarcadero project would generate some income. Defendant further urged plaintiffs to review and rely on the projections. Indeed, defendant informed Kimmell that he could provide "hot comfort” should plaintiff entertain any reservations about investing.
 

 Most tellingly, defendant personally requested "updated” projections, which he represented were reasonable and generated after a "thorough discussion with out West Coast administrator,” even though they were not based on the utility rate structure in effect at the time. The revised projections were sent to Gross with the expectation that they would be routed to plaintiffs. Plaintiffs duly received and reviewed these projections. Finally, defendant personally received a $20,000 commission for his efforts on behalf of the Embarcadero project. We conclude that under these circumstances, the record contains an adequate basis for the finding that defendant owed a duty of care to plaintiffs here.
 

 Defendant’s attempt to escape liability for negligent misrepresentation by relying on the Business Corporation Law is unpersuasive. Although sections 715 and 717 of the Business Corporation Law provide that corporate officers and directors may rely on information and opinions provided by corporate employees, they further provide that such reliance is justified only when the officer or director believes those employees to be reliable and competent in the matters presented.
 

 Supreme Court found that the employees in CESI’s San Diego office were "woefully negligent and abysmally uninformed.” Given the widespread publicity surrounding the local utility’s application for a rate change in 1987, and the failure to use current rate structures in the January 1988 projections, the record contains support for this factual finding.
 
 *
 
 Supreme Court further found that defendant had little or no personal
 
 *266
 
 dealings with the staff in the San Diego office, had no basis for assessing their competence, and failed to make any inquiry into the basis or methodology of the projections. As chief financial officer and chairman of CESI, Supreme Court concluded that defendant’s failure to make any inquiry as to these matters constituted negligence. As these findings are supported by the record, defendant was properly held liable for negligent misrepresentation.
 

 Accordingly the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Levine and Ciparick concur.
 

 Order affirmed, with costs.
 

 *
 

 An article published in the San Diego Tribune on March 12, 1987 proclaimed that the sought after rate changes "might doom cogeneration” and quoted the statement of a cogeneration industry representative that "[t]his rate will kill cogeneration.” Another article in the March 13,1987 issue of the Los Angeles Times printed the opinion of another cogeneration industry representative that "[t]he proposal would be ’disastrous’ for most co-generation systems.” A headliné on a March 13, 1987 article in the San Diego Tribune read, "Plan could cause cogeneration operations to close.” Public hearings on the proposed rate changes occurred throughout 1987. Various representatives of the cogeneration industry participated in these
 
 *266
 
 hearings. CESI was a member of one of the alliances which arrayed itself against the proposed rate changes.