In re AHT CORPORATION, et al., Debtor.

AHT Corporation, Plaintiff,

v.

BioShield Technologies, Inc., AHT Acquisition Corp., Timothy C. Moses, Jacques Elfersy, Scott Parliament, and Geoffrey Faux, Defendants.

No. M–47B(CM).
Bankruptcy No. 00–14446(ASH).
Adversary No. CIV. 00–2935.

United States District Court,
S.D. New York.

April 4, 2003.

Andrew D. Manitsky, Gravel and Shea, Burlington, VT and Tracy L. Klestadt, Klestadt & Winters, LLP, New York, NY, for Plaintiff–Appellant.

Fred D. Weinstein, Kurzman Eisenberg Corbin Lever & Goodman, LLP, White Plains, NY, for Defendant–Appellee Timothy C. Moses.

Theodore L. Hecht, Layton Brooks & Hecht LLP, New York, NY, for Defendant–Appellee Jacques Elfersy.

Mark S. Tulis, Oxman Tulis Kirkpatrick Wyatt & Geiger, White Plains, NY, for Defendant–Appellee Scott Parliament.

DECISION AND ORDER GRANTING INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING COUNTS IV, V AND VI

MCMAHON, District Judge.

This matter comes before me on plaintiff-debtor's appeal from the proposed findings of fact and conclusions of law prepared by The Hon. Adlai S. Hardin, U.S.B.J., on a motion for summary judgment by defendants Timothy Moses, Jacques Elfersy and Scott Parliament. The Bankruptcy Court heard the motion, but did not determine it, as the proceeding against these defendants did not raise "core" claims.[1] This Court reviews Judge Hardin's proposed findings of fact and conclusions of law (F & C) in light of the objections lodged thereto pursuant to Bankr.Rule 9033.[2] Review by the district court is *de novo*, and I have the power to accept, reject or modify the proposed findings of fact or conclusions of law. I also have the power to hear further evidence—which in this case is entirely unnecessary—and to recommit the matter to Judge Hardin. Bankr.Rule 9033(d).

The Court has reviewed Judge Hardin's proposed findings and conclusion, as well as the objections lodged thereto by AHT, the opposition to the objections filed by each of the moving defendants, and AHT's reply to those opposition papers. Upon *de novo* consideration of the entire record, I conclude that the defendants' motion for summary judgment should be granted, on

1. Judge Hardin ruled that the claims against the individual defendants in this adversary proceeding were not core claims. (F & C at 5–8) AHT does not object to this ruling. I, therefore, adopt Judge Hardin's analysis on the point.

2. Judge Hardin made his findings of fact and conclusions of law last July. Unfortunately, the Clerk of the Court erred in sending the objections to the wrong judge—Judge Conner, not Judge McMahon—and until Judge Conner's chambers discovered the error (which was quite recently) no one was aware that objections had been lodged to Judge Hardin's ruling. This accounts for the inordinate delay in ruling on the objections.

the ground that plaintiff has not raised a genuine issue of material fact concerning justifiable reliance, thus entitling defendants to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While there are a number of factual disputes raised by the papers, the *material* facts of this matter are largely undisputed. Though I modify Judge Hardin's findings in some minor respects, the parties will find that they are largely intact. Like Judge Hardin, I draw my findings of fact from the Complaint, AHT's "Statement of Fact" contained in the Joint Pre-Trial Order, and documents relied on by AHT in opposing summary judgment. In all cases, the facts are viewed most favorably to AHT, the non-moving party. *United States v. Diebold Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir. 1989).

## Findings of Fact

AHT is a Delaware corporation with its principal place of business in Tarrytown, New York. AHT was "a national provider of internet-based clinical e-commerce among physicians, other healthcare providers, and healthcare organizations," which focuses on automating laboratory and prescription transactions—two of the most frequent clinical transactions initiated by physicians.

During the summer of 1999, AHT sought potential merger partners and retained a financial advisor, which contacted twenty two potential acquirers for AHT. Three parties, including defendant BioSh-ield, submitted preliminary indications of interest.

BioShield is a Georgia corporation which, in 1999, began an expansion of its business operations by creating a new subsidiary known as "eMD," an internet project involving pharmaceutical healthcare. BioShield was co-founded in 1995 by individual defendants Moses and Elfersy. At all relevant times, Moses was the President and Chief Executive Officer of BioShield and a member of its Board of Directors. Until mid–2000, Elfersy was cochairman of the Board, Senior Vice President, Secretary and Treasurer. In addition, Moses and Elfersy were principal stockholders of BioShield, holding 20% and 21.6% of the company's shares, respectively.

Defendant Parliament was the Chief Financial Officer of BioShield from February 2000 until December 2000. He acted as one of the primary negotiators on behalf of BioShield in connection with the transaction that underlies this lawsuit.

On May 3, 2000, Dr. Jonathon T. Edelson, AHT's Chairman, President and CEO, and Jeffrey M. Sauerhoff, its Chief Financial Officer, spoke with representatives from BioShield, including Moses and Parliament. Two days later, the parties executed a mutual non-disclosure agreement designed to facilitate the exchange of non-public financial information.

In connection with the merger negotiations, AHT was represented, not only by Edelson and Sauerhoff, but by its General Counsel, Eddy Friedfeld; its outside counsel, the firm of O'Sullivan, Graev & Karabell (now known as O'Sullivan LLP); its Chief Information Officer, Robert Alger; and its investment bank, Chase H & Q.

In connection with the merger negotiations, BioShield was represented by Moses, Parliament, and Gruntal & Co. Elfersy

did not participate in any of the merger negotiations. He did not have any direct communication with any representative of AHT or make any personal representation to any representative of AHT about any subject touching on the merger.

The merger negotiations were conducted against a background of AHT's financial difficulties. During the period between March 31 and June 30, 2000, AHT's shareholder equity decreased by almost 50%, due in significant part to operating losses incurred by AHT during that quarter. From the earliest meetings, the parties openly discussed AHT's limited cash resources, which was the reason it was seeking a merger partner.

On May 12, 2000, BioShield sent a letter, signed by Moses, containing an initial, nonbinding indication of interest in purchasing AHT at a price of $3.50 to $5 per share. The letter advised that, "[t]his preliminary indication of interest has been vetted with the board of BioShield ..., which has approved the submission of this letter to you ...." The letter advised AHT to communicate with BioShield through Moses, Parliament or Roger Kahn of Gruntal & Co.

Further meetings followed, and BioShield conducted due diligence. On June 8, 2000, after reviewing certain non-public information, BioShield indicated that it would pay only $1.25 per share for AHT's stock. AHT rejected that offer as too low. Following further negotiations, and on June 12, 2000, BioShield made a third offer to pay $1.75 per share in a stock, or $20 million, in a stock rather than cash deal. The $20 million set price meant that, if BioShield's stock price fell following execution of the Merger Agreement, AHT shareholders would receive more shares of BioShield stock.

By June 18 the parties were exchanging drafts of a merger agreement. As is customary in these situations, they haggled over terms, and each side asked for inclusions that the other was not prepared to give. BioShield sought a "due diligence out" pursuant to which it could cancel the deal following execution of the Merger Agreement if its review of AHT's financial statements caused it to change its mind. AHT refused to agree to such a term.

AHT for its part wanted some assurance that if it went forward, the merger was likely to close. It asked that BioShield management and shareholders enter into a "voting agreement," which would bind them to vote their shares in favor of the merger. BioShield refused to agree to such a term.

It is the circumstances of that refusal that gives rise to this lawsuit.

On or about June 28 (the day before the Merger Agreement was finalized and approved by both sides), as the parties were in final negotiations, BioShield filed a Form 8–K with the Securities and Exchange Commission ("SEC"), disclosing that "Jacques Elfersy has announced his intention to semi-retire from both BioShield Technologies, Inc and EMD.com [Electronic Medical Distribution, Inc.] ..., thus tendering his resignation as on officer of both companies." The background to this announcement was as follows: on June 21, 2000, at a meeting of BioShield's Board, a motion was made to elect Moses as sole Chairman of the company. Elfersy, who had no advance notice of the motion, said, "You know what? If that's what you want to do, that's fine." Without further ado, he left the meeting (accompanied by another director) and did not return. Moses was elected the sole Chairman, and the Board adopted a resolution terminating Elfersy's employment.

Elfersy immediately hired an attorney to negotiate the terms of any continuing relationship he was to have with the com-

pany. The record does not disclose that he submitted a resignation from the Board of Directors at that time, either orally or in writing, so he was technically a member of the Board during the period June 28–30, 2000. I reject AHT's suggestion that walking out of a Board meeting in a fit of pique (justified or not) is the same thing as tendering a resignation. However, Elfersy by his own admission did not "act as a board member" after he left the room on June 21. In particular, he did not attend the Board meeting at which the AHT merger was considered.

AHT representatives were aware of the filing of the Form 8–K. Indeed, on June 29—the day that both companies' boards met to consider the Merger Agreement—Edelson met with Moses and was told that Elfersy had resigned as an officer of the corporation because of disagreement over the direction of BioShield's business. Domonick DeChiara, the attorney at O'Sullivan in charge of the transaction, learned that Elfersy's status had changed, and that he was no longer an officer, prior to the execution of the Merger Agreement. Parliament met with his counterpart sometime during the June 29–30 time frame and indicated that Elfersy was in the process of resigning. While the record does not disclose that anyone from BioShield told anyone from AHT that Elfersy was no longer a member of the Board—which at that time would not have been a true statement, since Elfersy had not yet tendered his resignation from the Board—AHT representatives knew before they signed the Merger Agreement that Elfersy, who owned 21.6% of BioShield's stock and whose support was critical to the success of the merger, was at odds with company management.

On or about June 28—as the news about Elfersy's changing status was becoming public—BioShield also rejected AHT's request for a voting agreement. Viewing the facts most favorably to AHT, in rejecting the proposal, Moses told Edelson that no such agreement was needed because he and Elfersy, as Board members, were both voting in favor of the deal, and so were other employees, who had smaller holdings.

On June 29, 2000, both Boards met to consider the merger. The Boards approved the merger by unanimous vote of those in attendance, constituting a quorum. Elfersy, although listed as a director in the draft minutes of the June 29 meeting (which, technically, he was), did not attend the BioShield Board meeting and did not vote to approve the merger.

On June 30, 2000, both sides executed the Agreement and Plan of Merger. The preamble to that document stated that the Boards of Directors of each party thereto (BioShield, its wholly-owned subsidiary AHT Acquisition Corp., and AHT) had unanimously approved the deal and deemed it to be in the best interest of its shareholders. The key terms of the Merger Agreement, for our purposes, were as follows:

The Merger Agreement required that the shareholders of both AHT and BioShield approve the deal as a condition precedent to the Merger; failure by either company's shareholders to approve the deal would result in the termination of the Agreement. No shareholder of either company was subject to any sort of voting agreement or other restriction. However, BioShield agreed to take "all necessary action" to permit issuance of the shares required to effectuate the merger, that it would "use its best efforts" to cause the shares to be issued, and that it would "take, or cause to be taken, all actions and to[sic], or cause to be done, all other things necessary, proper and advisable to consummate and make effective as promptly

as practicable the transactions contemplated by this Agreement." The Merger Agreements further provided that BioShield's "board of directors shall recommend the issuance of [BioShield] Common Stock to the holders of [AHT] Common Stock pursuant to this Agreement to holders of [BioShield] Common Stock . . . ." thus obligating the directors to recommend the deal to the shareholders.

At no time prior to signing the Merger Agreement did anyone representing AHT contact Elfersy to clarify his status or check on his support for the proposed merger. There was no agreement in place that would have prevented AHT's representatives from so doing.

Following the execution of the Merger Agreement, attorneys began to draft a Registration Statement, SEC Form S-4. An early draft of that Registration Statement, dated July 17, 2000 and produced from the files of the O'Sullivan firm (AHT's lawyers), omits Elfersy from the list of BioShield directors and describes Elfersy as "former co-chairman of the board, senior vice president, secretary, treasurer and director." The final version, which was filed with the SEC on August 2, 2000, also omitted Elfersy from the list of BioShield's "Directors, Executive Officers and Significant Employees."

And indeed, by the time the S-4 was filed, Elfersy had finally resigned from the Board. On or about August 1, 2000, Elfersy entered into a formal written agreement regarding the terms of his departure from BioShield's management. That agreement required Elfersy to resign as an officers and director of BioShield. By the terms of the agreement, his resignation was deemed effective as of June 21, 2000—although the resignation was not formally tendered until some six weeks after that date.

The Merger Agreement contained a warranty by AHT that it had not experienced a "Company Material Adverse Effect" since March 31, 2000, and that AHT had disclosed all pending or threatened legal actions that could have a material adverse effect. In a letter addressed to Edelson on August 11, 2000, Moses stated that BioShield believed that AHT had breached those warranties and representations and indicated the BioShield believed it had the right to terminate the Merger Agreement.

Also on August 11, Elfersy sent Moses a letter stating that he would not vote in favor of the proposed acquisition. Although the Agreement required AHT and BioShield to "consult with each other before issuing, and provide each other the opportunity to review and comment on any press release," BioShield issued a press release on August 14, 2000, without consulting AHT. The press release stated that BioShield had received "preliminary indications from shareholders holding more than 50% of the Company's common stock that they intend to vote their shares against the proposed merger with AHT . . . ."

AHT's stock plunged 33% in the immediate aftermath of the BioShield press release.

Following the issuance of the press release, Moses refused to speak with AHT and rejected requests by AHT's management to meet with BioShield's shareholders. Therefore, on August 18, 2000, AHT informed BioShield in writing that its issuance of the August 14 press release, its refusal to support the merger in discussions with shareholders, its refusal to join AHT in a meeting with BioShield shareholders and Moses' refusal to meet or speak with representatives of AHT constituted a breach of the Merger Agreement.

Thereafter representatives of the two sides did meet, but BioShield refused to renegotiate the deal or amend the Merger Agreement. Instead, on August 25, 2000, BioShield offered to purchase the assets of AHT in a Chapter 11 bankruptcy.

On September 7, 2000, AHT commenced an action against BioShield, Acquisition Corp., Moses, Elfersy, Parliament and Faux in the Superior Court of Fulton County, Georgia, alleging fraud, civil conspiracy and negligent misrepresentation against al defendants except Acquisition Corp., aiding and abetting against Elfersy, breach of the merger agreements and breach of implied covenant of good faith and fair dealing against BioShield and Acquisition Corp., and seeking $20 million in compensatory damages, $50 million in punitive damages, plus attorney's fees and the expenses of litigation in connection with the action for "bad faith and [being] stubbornly litigious."

The Georgia Action was conditionally settled several weeks later. As part of that settlement, AHT filed its Chapter 11 petition on September 22, 2000, and on the same day filed an Asset Purchase Agreement in which BioShield agreed to acquire the assets of AHT for $15 million. However, in November 2000, BioShield advised the Bankruptcy Court that it could not conclude the deal because it could not obtain the necessary financing. AHT's assets were eventually surrendered to its secured creditor, Cybear, Inc., which bid in its secured claim of approximately $4 million at a sale held November 21, 2000.

### THE INSTANT ADVERSARY PROCEEDING

On November 24, 2000, AHT filed this instant complaint. Count I alleges that BioShield and Acquisition Corp. breached the Merger Agreement by (1) falsely representing that the BioShield Board, includ-

ing Elfersy, had unanimously voted in favor of the merger and agreed to support the merger, (2) refusing to promptly prepare and file the Form S–4, (3) refusing to publicly support the Merger Agreement, (4) refusing to use all reasonable efforts to cause the merger to be approved, (5) refusing to permit AHT representatives to meet with BioShield shareholders to discuss the merits of the transaction, and (6) issuing the August 14, 2000 press release and making public comments to a newspaper without providing AHT an opportunity to review and comment. (AHT's Compl. ¶ 63). AHT also asserted claims against BioShield and Acquisition Corp. for breach of the Asset Purchase Agreement (Count II) (*See* AHT's Compl. ¶ 65–69); breach of the implied covenant of good faith and fair dealing "by engaging in a scheme to induce AHT to enter into the Merger Agreement based on false and misleading representations and then attempting to obtain AHT's assets for less than the consideration provided for in the Merger Agreement...." (Count III) (AHT's Compl. ¶ 74); fraud (Count IV) (*See* AHT's Compl. ¶ 76–84) and negligent misrepresentation (Count VI) (*See* AHT's Compl. ¶ 90–97). AHT demands that the post-petition superpriority claim granted to BioShield be equitably subordinated or expunged.

These claims are not at issue on this motion.

What is at issue are the claims against the individual defendants. Count IV of the Complaint alleges fraud against all defendants, on the ground that they (1) "had a motive and an opportunity to make false and misleading representations to AHT and its public shareholders to induce AHT to bind itself exclusively to BioShield so that BioShield could thereafter maximize its leverage against a cash-constrained AHT," which motive led them to make (2) "false and misleading representations that

the BioShield board of directors, including Elfersy, unanimously approved the Merger Agreement and were committed to the transaction . . . with the intent to deceive AHT and its public shareholders, and to induce AHT to enter into the Merger Agreement," all to AHT's detriment. (AHT's Compl. ¶ 77–78). AHT also alleged that the defendants (including the moving defendants) knew or should have known that the statements were false when made but made them nonetheless "with the intent to falsely depress the value of AHT's common stock and to impede AHT's ability to seek alternative financing or business arrangements, as part of BioShield's ongoing scheme to obtain AHT's assets for next to nothing." (AHT's Compl. ¶ 81–82). AHT asserts that the false representations, along with the repeated refusal to perform under the Merger Agreement or to support the merger, its public and unilateral announcement that its shareholders would reject the merger, and its meritless assertion that it had grounds to terminate the Merger Agreement all create the strong inference of conscious misbehavior or recklessness.

Count V is asserted against Elfersy, for "aiding and abetting" fraud. It states, in substance, that he provided substantial assistance and encouragement to BioShield's fraudulent conduct by failing to appear and vote at the June 29 meeting and then failing to correct statements that he was a member of the Board. (AHT's Compl. ¶ 87).

Count VI asserts a claim for negligent misrepresentation, alleging that defendants (1) made false and misleading representations both orally and in the Merger Agreement, Form S–4 and press releases, on which they knew AHT would rely, and upon which AHT did rely, and (2) acted with conscious indifference to the conse-

quences of their actions and with specific intent to cause harm to AHT. (AHT's Compl. ¶ 90–97).

As Judge Hardin correctly found, AHT's claims against BioShield and Acquisition Corp for breach of the Merger Agreement in Count I rely on the same core of facts as the claims against the individual defendants in Counts IV, V and VI—the refusal to perform under the Merger Agreement or to support the merger, the public announcement about shareholder dissatisfaction with the merger, and the refusal to meet with AHT or permit AHT to meet with BioShield's shareholders. The assertion that the defendants made false and misleading representations concerning the Board's unanimity and Elfersy's participation in the vote is contained or incorporated by reference in Counts I, IV, V and VI.

## MODIFIED CONCLUSIONS OF LAW

Judge Hardin's analysis focused on whether AHT's claims against the individual defendants merely restated its breach of contract claim against the corporate defendants. He concluded that they did, and thus recommends granting summary judgment to the defendants. I agree with the result, but find it less complicated to rule on a different ground; AHT cannot prove fraud or negligent misrepresentation claims against the individual defendants because it cannot prove, as a matter of law, that it justifiably relied on any of the allegedly false and fraudulent representations. Indeed, as to Elfersy, it cannot prove that he made any representation at all—indeed, it is undisputed that he did not.

### Count IV Must Be Dismissed as to All Moving Defendants

■ Count IV, which is pleaded against all defendants, alleges that a number of statements were falsely and fraudulently

made to AHT prior to the execution of the merger agreement concerning Elfersy's participation in and support for the merger.

To the extent that plaintiff purports to assert Count IV against Elfersy, the claim must be dismissed because there is no evidence in this record that Elfersy ever made any statement, on any subject, to any representative of AHT—or for that matter was ever asked to do so. (See analysis of Count V, *infra.*)

■ As to the other two moving defendants: New York law requires that reliance on a statement must be found to be justifiable under all the circumstances or no fraud claim lies. *Granite Partners, L.P., v. Bear, Stearns & Co., Inc.,* 58 F.Supp.2d 228, 259 (S.D.N.Y.1999), *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

> A party entering into a transaction has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transaction. Reasonable reliance may be found wanting where the plaintiff failed to conduct its own diligent research into the risks or benefits of a particular transaction. Sophisticated parties may well be under a duty to make affirmative efforts to protect themselves from misrepresentations, and cannot be heard to complain when they fail to make diligent inquiries.

*Granite Partners, L.P.,* 58 F.Supp.2d at 259 (citations omitted).

The lynchpin of AHT's fraud theory is that AHT was led to believe that Elfersy supported the merger and would vote his stock in favor of the deal. The basis for this belief was Moses' June 28 statement to Edelson, made in the context of explaining why no tie-up agreement was necessary, and the statements in the Merger

Agreement and in the various public announcements that the Board had approved the deal "unanimously," with no caveat about absences.

However, the undisputed evidence is that AHT—led by a sophisticated management team, represented by experienced merger lawyers and advised by investment bankers—knew all of the following *before it bound itself to the deal by signing the Merger Agreement:*

(1) Elfersy, a co-founder of the company and a 21% shareholder, was resigning as an officer of the company and changing his status with the company, and a public announcement to that effect had been filed with the SEC on June 28;

(2) Elfersy, per Moses, was leaving company management due to disagreements over the direction the company was taking; (Edelson EBT at 343–352)

(3) Elfersy's status as a member of the Board was unclear; Parliament told AHT representatives sometime during the June 29–30 period that Elfersy might be leaving the Board;

(4) Elfersy had not participated in a single negotiating session or important event in connection with the merger;

(5) Shareholder approval was a pre-condition to the consummation of the merger;

(6) BioShield, through Moses, refused to give AHT the shareholder voting agreement it had sought, which meant that no shareholder was legally bound to vote in favor of the merger.

In the circumstances, a legally sophisticated party such as AHT should hardly have been inclined to put much stock in Moses' statement that Elfersy was on board for the deal. Indeed, a reasonable person, knowing only that a 21% shareholder had differences with Moses and

that his status within the company was changing as a result, would have been expected to contact Elfersy in order to see where he stood. Yet no one representing AHT did that. Nor did anyone inquire whether Elfersy—whose changing status was the subject of an SEC filing at a critical juncture in the negotiations—had been present at the June 29 Board meeting where the merger was discussed. Nothing in this record suggests that talking to Elfersy was out of bounds, or that Moses refused to continue negotiations if AHT contacted Elfersy directly. Therefore, AHT's failure to make direct inquiry is unreasonable as a matter of law, and precludes any finding of justifiable reliance.

In *Abrahami v. UPC Construction Co., Inc.*, 224 A.D.2d 231, 638 N.Y.S.2d 11 (1st Dep't 1996) the plaintiffs asserted that the defendant made misrepresentations in the form of balance sheets and financial statements performed by the defendant's accounting firm concerning the financial status of the defendant company. *Id.* at 12–13. Based on these representations, the plaintiffs invested a substantial amount of money in the defendant company. *Id.* at 12. The court found that the plaintiffs' reliance on the representations was not justified, thereby rendering their claim of fraud invalid. *Id.* at 13. Since the plaintiffs were experienced businesspeople, they had a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they were assuming, which they failed to do. *Abrahami*, 638 N.Y.S.2d at 13. Furthermore, the plaintiffs had the means to discover the true nature of the transaction they were about to enter, and they should have used those means to conduct an independent audit of the defendant company which would have shed light on the reality of the proposed transaction. *Id.* at 13–14. Not only did the plaintiffs have a duty and the means to investigate the defendant's financial condition, they were also on notice of the defendant's possible precarious financial condition and certainly should have investigated the proposed transaction further. *Id.* at 14. For these reasons, the court did not find the plaintiffs' reliance justified.

Similar to the plaintiffs reliance in *Abrahami*, AHT's reliance is not justified. First, AHT was clearly on notice that Elfersy, a stockholder owning more than 20% of the stock, had recently resigned and that his status within the company he had co-founded was changing. AHT was aware that the merger was conditioned on a shareholder vote. AHT obviously had apprehensions about the merger; it had asked for a voting agreement in order to tie up the principal shareholders. AHT's affairs were conducted by sophisticated businesspeople; they were under a duty to exercise ordinary diligence and to make independent inquiries about whether Elfersy was still on board. AHT surely had the means to investigate Elfersy's disposition towards the merger; it only entailed calling Elfersy to discuss the matter with him.

*Schlaifer Nance & Company v. Estate of Andy Warhol*, 119 F.3d 91 (2d Cir.1997) is particularly instructive here. In *Schlaifer*, the plaintiff filed a complaint alleging fraud against the Estate of Andy Warhol, arguing that the Estate misled the plaintiff by misrepresenting that it had exclusive control of Warhol's assets, and by not explaining that many of Warhol's works had fallen into the public domain. *Id.* at 96. The plaintiff had entered an agreement with and licensed certain rights from the Warhol Estate. The Estate assured the plaintiff that it (the Estate) controlled all rights to Warhol's works when such was clearly not the case. *Id.* at 99. The Second Circuit found that although the Estate had, in fact, made misrepresentations to

the plaintiff, the latter's reliance on such misrepresentations was not reasonable. *Id.* at 98–99. Since reasonable reliance is a necessary element to fraud, the plaintiff's claim could not prevail. *Id.* at 99. Plaintiff's reliance was unreasonable for several reasons. First, the parties involved were sophisticated businesspeople involved in a major transaction. Secondly, the plaintiff was informed that Warhol did not own copyrights on all of his images. Thirdly, the plaintiff's attorney admitted that she had apprehensions as to whether Warhol (and his Estate) owned copyrights for all of his works because of (1) the magnitude of his works, and (2) since he was a commercial artist he often sold the rights to a commissioned work, thus surrendering the copyright. Fourthly, the plaintiff's counsel was aware that if Warhol's prints were issued without a copyright, then it was likely that such works had become a part of the public domain and could have no copy right protection. Finally, even the language of the parties' licensing agreement suggested that the Estate did not have exclusive control over Warhol's work. *Schlaifer Nance & Company v. Estate of Andy Warhol,* 119 F.3d at 98–100. The Second Circuit concluded that plaintiff's reliance on the misrepresentation made to him by one of the combatants was unreasonable as a matter of law. *Id.* at 101.

In *Schlaifer,* the fact that the parties were experienced businesspeople involved in a major transaction, that the plaintiff was aware that not all of Warhol's images had copyrights, the plaintiff's lawyers apprehensions and knowledge that Warhol's works had likely become part of the public domain, and the language of the agreement were deemed sufficient to put the plaintiff on notice that it should do further due diligence before it could reasonably rely on the Estate's representations that it owned all rights to every Warhol work.

Here, the combination of Elfersy's publicly-announced resignation, Moses's statement that Elfersy's resignation was due to difference relating to the operation of BioShield and BioShield's refusal to tie the hands of its principal shareholders when it came to voting on the merger was certainly "notice that would have led any reasonably diligent attorney or corporate officer" to inquire of Elfersy whether he was planning to support the deal. In *Schlaifer,* the plaintiff was clearly on notice that Warhol's Estate did not own all of the rights to every Warhol work and, therefore, could not have reasonably relied on the Estate's representations that it did. Similarly, AHT was on notice that the representation that the BioShield board of directors, including Elfersy, unanimously approved the Merger Agreement and were committed to the transaction was or could be false and, therefore, could not have reasonably relied on a representation that it knew (or should have known by performing an investigation) was false.

For that reason alone, Count IV must be dismissed as to all defendants.

**Count V Must Be Dismissed as to Elfersy**

In Count V, AHT alleges that Elfersy aided and abetted the fraud perpetrated by the other defendants. Obviously, he did not do so by making misrepresentations to them, since it is conceded that he never spoke to them and was never asked to do so. It appears that plaintiff contends that Elfersy aided and abetted Moses and the other BioShield defendants after the merger agreement was executed by declining to vote his shares in favor of the deal.

In order to prevail on a claim of aiding and abetting fraud, AHT must establish three things: that BioShield perpetrated a fraud; that Elfersy had actual

knowledge of the existence of the fraudulent scheme; and, Elfersy provided substantial assistance to the other defendants in advancing the underlying fraud. *Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000). AHT cannot prevail as a matter of law on its aiding and abetting claim because it cannot get over the first hurdle. Since reliance on Moses' statement that Elfersy supported the merger was unreasonable as a matter of law, there was no fraud.

 Moreover, assuming *arguendo* that reasonable reliance could be proved, there is no evidence in this record that Elfersy had actual knowledge of the fraudulent scheme to subvert the merger. In order to adequately plead scienter in an aiding and abetting fraud claim, the plaintiff must allege sufficient facts to support a strong inference of fraudulent intent. *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 127 (S.D.N.Y.1997) (citations omitted). Plaintiffs may raise such an inference in one of two ways: (1) by alleging facts showing a motive for participating in a fraudulent scheme and a clear opportunity to do so; or (2) by identifying circumstances indicative of conscious behavior. *Id.* The only "evidence" cited by AHT in its objection is the fact that Elfersy continues to do some work for BioShield after his resignation from the Board of Directors and as an officer. And so he did—by agreement with the company, he continued to advise BioShield on patent, technological and scientific matters. But no reasonable juror could draw from that fact an inference that Elfersy was aware of Moses's alleged pre-execution misstatements, or that Elfersy and Moses ever discussed, let alone conspired to subvert, the proposed merger—even after the market drop in BioShield stock. Furthermore, the fact that Elfersy had his own economic interests in mind is not sufficient to satisfy the scienter requirement. "Ordinary economic motives are insufficient to support the scienter element of an aiding and abetting claim." *Id.* at 127. As Elfersy points out, he had an absolute legal right to protect his economic interests—no voting agreement bound him to the deal and he personally had never voted to support it.

Count V is dismissed.

## Count VI Must Be Dismissed as against All Defendants

The last count that is the subject of the instant motion is Count VI, which alleges negligent misrepresentation against all defendants.

██ I reject the notion that any ruling by Judge Hardin binds me, as a reviewing court, under the law of the case doctrine. However, the *doctrine would not apply* here in any event. AHT argues that the Bankruptcy Court's decision denying the defendants' motion to dismiss the complaint, and all the claims therein, precludes an award of summary judgment dismissing that claim. But a decision denying a motion to dismiss does not mean that a claim has merit and will ultimately succeed. If it did, we could simply enter judgment for the plaintiff at the same time we denied the motion to dismiss for failure to state a claim and spare ourselves a lot of unnecessary aggravation. The complaint no doubt *pleads* a claim sufficiently to withstand a pre-answer motion. But the question before Judge Hardin this go round—and now before me—is whether AHT has adduced any evidence tending to *prove* that claim, which must happen if the claim is to survive this post-discovery motion.

AHT has not done so.

As to Elfersy, the case is quite clear. Since everyone agrees that he never made any statement to any representative of AHT, he cannot be held liable on a theory of negligent misrepresentation—which re-

quires that a defendant make some statement "expressed directly" to the plaintiff. *Suzy Phillips Originals, Inc. v. Coville, Inc.,* 939 F.Supp. 1012, 1016 (E.D.N.Y. 1996), aff'd 125 F.3d 845 (2d Cir.1997); *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977).

As to the other moving defendants: in order to prevail on a negligent misrepresentation theory, a plaintiff must establish that the defendants had a duty, based upon a "special relationship," to give correct information to AHT, and that AHT reasonably relied on the false information to its detriment. *Hydro Investors, Inc., v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir.2000); *White v. Guarente,* 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977). I have already ruled that AHT could not have reasonably relied on any representation concerning Elfersy's support for the merger, given his precipitous withdrawal from his management role at the company at a crucial moment in the negotiations, so the claim fails for that reason alone.

Additionally, AHT has not established that the moving defendants had any special relationship with it that would give rise to a "special duty of care." Liability for negligent misrepresentation "has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party ...." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996). AHT was a sophisticated party, the defendants' contra party in a merger negotiation and was represented at all times during the negotiation by counsel and investment advisers. It was conducting its own due diligence on all matters material to the merger. It stood in the position of an ordinary seller, with BioShield an ordinary buyer, in an arms' length commercial transaction. That is the antithesis of a "relationship of special trust and confidence." *See Kimmell,* 89 N.Y.2d at 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (professionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients); *Fleet Bank v. Pine Knoll Corp.,* 736 N.Y.S.2d 737 (3d Dep't 2002) (a special relationship requires a closer degree of trust than an ordinary business relationship for that reason, there typically is no fiduciary relationship between a borrower and a bank); *Andres v. LeRoy Adventures,* 201 A.D.2d at 262, 607 N.Y.S.2d 261 (1st Dep't 1994) (holding that a special relationship giving rise to a duty to impart correct information could not be discerned from the arm's length dealings between the plaintiff, a potential customer, and the defendant, a restaurant owner).

AHT contends that a relationship of special trust arises because BioShield and its officers were in a better position to know whether Elfersy was on the Board and whether he and Moses actually supported the merger. However, I have already ruled that it was unreasonable as a matter of law for AHT to rely on Moses' representation about Elfersy's support for the merger, so it is not possible that a relationship of special trust could exist as to those statements. And AHT has not adduced even a scintilla evidence that Moses did not in fact support the merger at the time he made the alleged misrepresentations— i.e., prior to the execution of the Merger Agreement. That he changed his mind as the summer wore on is indisputable, but that hardly supports an inference that Moses's statements, whether about Elfersy or about the Board's support for the deal, were false when they were made. To the extent that AHT complains of post-Merger Agreement conduct by Moses and others, it is not complaining about misrepresenta-

tions on which it relied in entering into the Merger Agreement.

As Judge Hardin correctly concluded, AHT's claim for breach of the contract lies in breach of contract, which cannot be characterized as misrepresentation of intent to perform under the contract. *See Best Western Int'l Inc. v. CSI Int'l Corp.,* 1994 WL 465905 at *4 (S.D.N.Y. Aug.23, 1994)("The majority of the [New York] courts, including the Appellate Division, have held that simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligation thereunder, is insufficient to state an independent tort claim").

## CONCLUSION

The moving defendants' motions for summary judgment are granted in all respects: Count IV is dismissed as to Timothy Moses, Jacques Elfersy, and Scott Parliament; Count V is dismissed as to Elfersy; and Count VI is dismissed as against Moses, Elfersy, and Parliament.[3]

This constitutes the decision and order of the Court.

---

3. Having elected to dispose of these motions on the alternate grounds propounded by defendants, I need not and do not reach the issue of whether the various fraud and misrepresentation claims are or are not coterminous with the breach of contract claim, or whether the misrepresentations alleged are or are not collateral to the Merger Agreement.