(September 18, 2014)

■ NORTH STAR CONTRACTING CORP., Appellant, v MTA CAPITAL CONSTRUCTION COMPANY, Respondent. [993 NYS2d 11]—

Order, Supreme Court, New York County (Anil C. Singh, J.),

entered April 24, 2013, which, insofar as appealed from as limited by the briefs, granted defendant's motion to dismiss the first cause of action for negligent misrepresentation and the second cause of action for tortious interference with contract, unanimously modified, on the law, to deny the portion of the motion seeking to dismiss the first cause of action, and otherwise affirmed, without costs.

Defendant MTA Capital Construction Company (MTA-CC) was the construction manager of a project taking place along the 7th Avenue/Broadway subway line in Manhattan; the MTA-New York City Transit Authority (NYCT), to which MTA-CC is a sister entity, was the project's owner. In connection with the project, MTA-CC entered into a contract with nonparty Judlau Contracting, Inc. under which Judlau became the project's general contractor. Judlau then entered into a contract with plaintiff North Star Contracting Corp., under which North Star became the subcontractor to perform the necessary track work for the project.

As NYCT designed them, the tracks to be installed were to use a vibration dampening system that required the tracks' rails to fasten onto specially designed Low Vibration Track blocks (LVT blocks). According to the complaint, the subcontract between North Star and Judlau required North Star to adhere to NYCT's plans and specifications for the project. NYCT's plans and specifications, in turn, required the use of LVT blocks manufactured by nonparty Permanent Way Corporation (PWC), the exclusive manufacturer and patent holder of these LVT blocks. Thus, on October 24, 2006, North Star entered into a purchase order agreement with PWC to buy all the LVT blocks for the project.

North Star was to use three different types of LVT blocks: Type A, Type GR and Type DXO. The blocks were manufactured with concrete inserts cast into them; fasteners would then be placed into the concrete inserts to attach the rails to the LVT blocks. Until NYCT designated the LVT blocks for this project, no entity in the United States had ever used them for a track crossover switch—a fact North Star avers it did not know until well after it placed its bid on the project.

North Star alleges that in October 2007, when it began installing Type A LVT blocks, it discovered that the blocks had been defectively made—specifically, that PWC had allegedly incorrectly positioned the concrete inserts during manufacturing. According to the allegations in the complaint, MTA-CC directed North Star to remove and replace some of the Type A blocks, thus delaying the project, creating additional work and imposing unanticipated costs.

North Star further averred that after installation of the defective Type A blocks, MTA-CC represented that it had conducted an investigation of PWC's manufacturing process, and, after that investigation, specifically represented to North Star that PWC had modified its quality control measures so that the Type A LVT blocks would be free from defects. Likewise, as with the Type A blocks, MTA-CC allegedly "specifically represented to North Star that it had reviewed PWC's manufacturing and design processes for the . . . DXO blocks to ensure that they would be satisfactory" for use in the project.

North Star then received a second batch of LVT blocks, this time Type DXO blocks. North Star received those Type DXO blocks around January 23, 2008 and installed them on the tracks until around May 8, 2008. At that time, however, North Star alleges that, as with the Type A blocks, the Type DXO blocks were defective despite MTA-CC's representations that they would be suitable for the project. Specifically, according to North Star, cracks allegedly began to develop in the Type DXO blocks when bolts were tightened into them using the torque that PWC had specified. On July 16, 2008 as a result of the defects, MTA-CC directed North Star to remove and replace the installed DXO blocks. After a further delay of around five months, North Star alleged, it received yet another set of replacement blocks—again, Type DXO—and installed that set of replacement blocks in the fall of 2008.

North Star commenced this action in August 2011, asserting causes of action for negligent misrepresentation, tortious interference with contract and unjust enrichment.[1] The complaint alleged, among other things, that "during the course of the [p]roject," PWC and MTA-CC represented "on numerous occasions" that PWC's LVT blocks were suitable for their intended purpose and of the highest quality, even though the blocks had never, in fact, been tested. Additionally, the complaint alleges that, unbeknownst to North Star, MTA-CC and PWC had a covert agreement in which MTA-CC "was to direct [North Star] to perform the [subcontract] work free of charge to either MTA-CC or PWC." Thus, North Star concludes, MTA-CC and PWC were, in essence, surreptitiously using North Star as a means to conduct research and development on the LVT blocks.

According to the allegations in the complaint, MTA-CC "was aware that its statements would be used by North Star . . . to

---

1. In September 2009, North Star commenced a separate action against Judlau, asserting claims for breach of contract, unjust enrichment and account stated. North Star cross-moved to consolidate the Judlau action with this one, but the IAS court denied the cross motion as moot.

induce North Star to install the improperly designed and defective blocks at the [p]roject." North Star further alleged that as a result of MTA-CC's negligent misrepresentations, it incurred more than $800,000 in extra costs and more than $900,000 in delay damages.

The IAS court granted MTA-CC's pre-answer motion to dismiss, finding that the complaint did not support North Star's contention that there was a special relationship of trust and confidence between it and MTA-CC. Rather, the court found, the complaint alleged merely the existence of an ordinary business relationship between North Star and MTA-CC; therefore, North Star had not pleaded sufficient facts to support a claim for negligent misrepresentation.[2] Similarly, the IAS court dismissed the tortious interference claim, finding that North Star failed adequately to show that MTA-CC had induced an actual breach of the purchase order between North Star and PWC.

As North Star concedes, there is no contractual privity between it and MTA-CC; rather, North Star asserts, the relationship between it and MTA-CC was close enough to be the functional equivalent of privity.

To properly assert a claim on a theory of negligent misrepresentation, a plaintiff must plead: "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (*Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 180 [2011], quoting *J.A.O. Acquisition Corp. v Stavitsky*, 8 NY3d 144, 148 [2007]).

As to the first element, a court will find a special relationship if the record supports "a relationship so close as to approach that of privity" (*Sykes v RFD Third Ave. 1 Assoc., LLC*, 67 AD3d 162, 164 [1st Dept 2009], *affd* 15 NY3d 370 [2010] [internal quotation marks omitted]) or, stated another way, the "functional equivalent of contractual privity" (*Ossining Union Free Sch. Dist. v Anderson LaRocca Anderson*, 73 NY2d 417, 419 [1989]). Under this standard, before liability for negligent misrepresentation may attach in favor of a third party, there must be: (1) an awareness by the maker of the statement that the statement is to be used for a particular purpose; (2) reliance

---

**2.** North Star has abandoned its third cause of action for unjust enrichment. Thus, the only questions before this Court are whether North Star should be permitted to proceed on its first cause of action for negligent misrepresentation and its second cause of action for tortious interference with contract.

by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance (*Ossining Union Free Sch. Dist.*, 73 NY2d at 425, citing *Credit Alliance Corp. v Arthur Andersen & Co.*, 65 NY2d 536, 551 [1985]).

We find that the complaint adequately alleges, based on representations made during the course of the contract, that the relationship between MTA-CC and North Star approached privity. Notably, MTA-CC was in contractual privity with Judlau and Judlau was in contractual privity with North Star; the purpose of the subcontract between Judlau and North Star was to further the prime contract between MTA-CC and Judlau. The complaint states that "MTA-CC was aware that its statements would be used by North Star, Judlau's subcontractor, to induce North Star to install the improperly designed and defective blocks at the [p]roject." Likewise, the complaint links MTA-CC to North Star. Indeed, MTA-CC, as the project's construction manager, was the very entity that required North Star's work to be performed with LVT blocks, and those blocks were available only from PWC, the distributor and sole manufacturer. Moreover, the complaint alleges that MTA-CC conducted an investigation of the manufacturing and design process for the blocks, but that North Star was not permitted to conduct an investigation for itself.

In an affidavit submitted in opposition to the motion to dismiss,[3] Joseph Lovece, North Star's president, states that had it not been for MTA-CC's misrepresentations regarding its investigation of the defects in the LVT blocks, North Star would not have installed the second set of blocks without a written change order guaranteeing its payment, but instead would have chosen to breach the contract. However, North Star states, because of MTA-CC's representation that PWC was remedying the problems, it chose to work with the defective blocks. At the pleading stage, drawing all inferences in favor of the pleading party (*Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998]), these allegations are sufficient to allow the negligent misrepresentation claim to proceed with respect to the allegations about the second set of LVT blocks.

Crucially, North Star alleges that MTA-CC did, in fact, have "unique or specialized expertise" with respect to the suitability

---

**3.** Certain of the allegations are not contained in the complaint, but only in Lovece's affidavit. Under CPLR 3211 (c), a trial court may use affidavits in its consideration of a pleading motion to dismiss (*see Rovello v Orofino Realty Co.*, 40 NY2d 633, 635-636 [1976]).

of the DXO blocks, as it had conducted an investigation of the manufacturing process and, after that investigation, had assured North Star that the blocks would work as planned. Indeed, North Star also represented at oral argument that MTA-CC had performed an on-site investigation of the blocks' manufacturing process, but that North Star was not permitted to attend that on-site investigation because of "proprietary intellectual property issues."

With respect to any misrepresentations allegedly made before North Star entered into its contract with Judlau, the complaint fails to allege reliance. First, nowhere in the complaint does North Star specify when MTA-CC purportedly made any misrepresentations before the contract commenced; at most, North Star alleges that MTA-CC represented "on numerous occasions" that PWC's LVT blocks were suitable for their intended purpose. Even though the approximate date of any misrepresentation would, of course, be a fact within North Star's knowledge, never does North Star specifically allege that MTA-CC actually misrepresented any facts before North Star entered into the contract with Judlau.

Although Lovece avers that had North Star known the true facts about the LVT blocks—that is, had North Star known that it was actually bidding on a research and development project—it would have put in a higher bid or would have refrained from entering into the project entirely. But these averments, even taken as true, do not salvage the negligent misrepresentation claim with respect to any purported misrepresentations before the Judlau contract. On the contrary, North Star—a contractor highly and singularly experienced in the track work that Judlau hired it to perform—still could not have reasonably relied, at that juncture on MTA-CC's representations about the LVT blocks' suitability for the project. Further, given its experience and qualifications, North Star does not, and cannot, plead that MTA-CC had superior knowledge (*see e.g. Greentech Research LLC v Wissman*, 104 AD3d 540 [1st Dept 2013]).

The complaint fails to state a claim for tortious interference with contract. As noted above, North Star alleges that defendant entered into a "clandestine agreement" with PWC, thereby inducing it to breach its contract with plaintiff. However, because defendant's alleged inducement occurred after PWC's alleged breaches, it could not have been the "but for" cause of PWC's purported breaches (*see Parrott v Logos Capital Mgt., LLC*, 91 AD3d 488, 489 [1st Dept 2012]; *Wells Fargo Bank, N.A. v ADF Operating Corp.*, 50 AD3d 280, 281 [1st Dept 2008]).

We have considered the parties' remaining contentions and

find them unavailing. Concur—Gonzalez, P.J., Friedman, Sweeny, Moskowitz and Clark, JJ. 