■ J.P. MORGAN SECURITIES INC., Respondent, v JASON ADER et al., Appellants. [9 NYS3d 181]—

Order, Supreme Court, New York County (Melvin L. Schweitzer, J.), entered June 3, 2013, which, insofar as appealed from as limited by the briefs, granted plaintiff's motion for summary judgment dismissing defendants' counterclaim for negligent misrepresentation, affirmed, without costs. Order, same court and Justice, entered April 17, 2014, which granted plaintiff's motion to strike defendants' demand for a jury trial on their counterclaim for fraudulent inducement, reversed, on the law, without costs, and the motion denied.

The motion court properly dismissed defendants' counterclaim for negligent misrepresentation. "A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (*J.A.O. Acquisition Corp. v Stavitsky*, 8 NY3d 144, 148 [2007]). In commercial cases "a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, [is] such than in morals and good conscience the one has the right to rely upon the other for information" (*Kimmell v Schaefer*, 89 NY2d 257, 263 [1996] [internal quotation marks omitted]). Reliance on the statements must be justifiable, and "not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care" (*id.*). "Rather, liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured

party such that reliance on the negligent misrepresentation is justified" (*id.*). In order to impose tort liability in a commercial case, "there must be some identifiable source of a special duty of care" (*id.* at 264).

In this context we have held that such a special duty will be found "if the record supports a relationship so close as to approach that of privity" (*see North Star Contr. Corp. v MTA Capital Constr. Co.*, 120 AD3d 1066, 1069 [1st Dept 2014] [internal quotation marks omitted]). Generally, however, an arm's length business relationship between sophisticated parties will not give rise to a confidential or fiduciary relationship that would support a cause of action for negligent misrepresentation (*Greentech Research LLC v Wissman*, 104 AD3d 540 [1st Dept 2013]).

The evidence on the record before us, which includes allegations of plaintiff's superior knowledge of the hedge fund business and its past dealings with defendant Ader, who had worked for plaintiff's predecessor in interest for some years, is not sufficient to establish a special relationship that would justify defendants' reliance on plaintiff's alleged misrepresentations (*see Kimmell v Schaefer*, 89 NY2d at 257; *Greentech Research*, 104 AD3d at 540).

With respect to the issue of the application of the jury waiver provision in the parties' agreement to defendants' counterclaim for fraudulent inducement, we find that the court erred in granting plaintiff's motion to strike defendants' jury trial demand.

We have previously held that a contractual jury waiver provision is inapplicable to a fraudulent inducement cause of action that challenges the validity of the underlying agreement (*see China Dev. Indus. Bank v Morgan Stanley & Co. Inc.*, 86 AD3d 435, 436-437 [1st Dept 2011]; *Wells Fargo Bank, N.A. v Stargate Films, Inc.*, 18 AD3d 264, 265 [1st Dept 2005]). Moreover, "[i]t is of no consequence that the [counterclaim] does not contain the word 'rescission' or expressly state that it challenges the validity of the . . . agreement" (*Ambac Assur. Corp. v DLJ Mtge. Capital, Inc.*, 102 AD3d 487, 488 [1st Dept 2013]). In cases where the fraudulent inducement allegations, if proved, would void the agreement, including the jury waiver clause, the party is entitled to a jury trial on the claim (*see Bank of N.Y. v Cheng Yu Corp.*, 67 AD2d 961 [2d Dept 1979]; *see also Ferry v Poughkeepsie Galleria Co.*, 197 AD2d 913 [4th Dept 1993]).

As our dissenting colleague acknowledges, "a defrauded party to a contract may elect to either disaffirm the contract by a

prompt rescission or stand on the contract and thereafter maintain an action at law for damages attributable to the fraud" (*Big Apple Car v City of New York*, 204 AD2d 109, 110-111 [1st Dept 1994]). As a result, a party alleging fraudulent inducement that elects to bring an action for damages, as opposed to opting for rescission may, under certain circumstances, still challenge the validity of the agreement (*see Ambac Assur. Corp.*, 102 AD3d at 488).

Thus, where, as here, a party sufficiently pleads that it was fraudulently induced to enter into a contract, and only relies on the agreement as a basis for its defense against breach of contract allegations and a claim for reformation to recover overpayments, it is not precluded from challenging the validity of the contract for purposes of avoiding the jury waiver clause with respect to the adjudication of its fraudulent inducement claim (*see Ambac Assur. Corp.*, 102 AD3d at 488; *Wells Fargo Bank*, 18 AD3d at 265). Although the dissent contends otherwise, we find that the facts of this case fall within *Ambac*'s parameters, and thus reinstate defendants' demand for a jury trial.

We have considered the parties' remaining arguments and find them to be without merit. Concur—Sweeny, J.P., Moskowitz, Richter and Clark, JJ.

Andrias, J., dissents in part in a memorandum as follows: I agree with the majority that Supreme Court properly awarded summary judgment to plaintiff dismissing defendants' counterclaim for negligent misrepresentation. However, because defendants' primary claims are for reformation and monetary damages, which do not challenge the validity of the agreements at issue, I disagree with the majority with respect to its holding that the court erred when it granted plaintiff's motion to strike defendants' demand for a jury trial on their counterclaim for fraudulent inducement. Accordingly, I dissent in part.

Following extensive negotiations, in July and August 2003, defendant Jason Ader and plaintiff's predecessor in interest, Bear Stearns, entered into a series of preliminary agreements in connection with an investment by Bear Stearns in Hayground Cove, a hedge fund that Ader was developing. These included a letter agreement setting forth the proposed terms of the parties' deal, subject to the execution of definitive agreements.

On November 24, 2003, the parties executed a "Revenue Sharing Agreement" (RSA) and an "Investment Agreement." These agreements provided that in exchange for Bear Stearns's seed investment, Hayground would pay Bear Stearns 25% of

"gross revenues" less: (i) eligible operating expenses, up to a maximum of $600,000; (ii) customary marketing fees paid to non-affiliated third parties that were the result of arm's length negotiations; and (iii) payments on certain loans to Hayground for startup expenses.

Following Bear Stearns's investment, Hayground began to attract further investors, and grew in size. In February 2005, at defendants' request, the parties executed the First Amendment to the RSA which allowed the "Expense Cap" to increase commensurate with Hayground's assets under management. In June 2005, the parties again modified their deal through a "Global Agreement" and a 2005 Investment Agreement under which Bear Stearns, pursuant to Hayground's request, switched its investment to Hayground's newly formed market-neutral fund. The 2005 Investment Agreement, however, specifically acknowledged that "the Partnership Agreement, this Agreement, the Global Agreement and the Revenue Sharing Agreement are the valid and binding obligations of the Partnership, enforceable against the Partnership in accordance with their respective terms."

In January 2009, plaintiff commenced this action, alleging that defendants miscalculated revenue-sharing payments by deducting the expense cap from the 25% revenue share, rather than from gross revenues; deducting amounts from revenues for marketing expenses not actually paid to third-party marketers; and inflating the expense cap by improperly calculating assets under management to include leverage and short positions rather than basing it on investor equity alone. Plaintiff asserted causes of action for breach of contract and a declaratory judgment, and sought damages to be determined at trial of not less than $8,000,000.

In their answer, defendants denied liability and asserted multiple affirmative defenses, including that "[p]laintiff's claims are barred, in whole or in part, by the doctrines of reformation and/or mutual mistake." Defendants also asserted counterclaims for fraudulent inducement, negligent misrepresentation, and reformation.

In support of their fraudulent inducement and negligent misrepresentation counterclaims, defendants alleged, inter alia, that: (i) in reliance on Bear Stearns's false or reckless representations concerning marketing assistance, access to Bear Stearns's prime brokerage operation, and introductions to potential investors, defendants selected Bear Stearns's seeding offer over alternative and more favorable offers; (ii) "notwithstanding repeated and continuing false assurances from Barry

Cohen [of Bear Stearns] . . . , by late March or early April of 2004, it became clear that, as Cohen finally admitted, Bear Stearns would not . . . fulfill its representations, . . . ostensibly due to various regulatory and legal obstacles to its doing so"; and (iii) as a result, "Hayground was forced to spend its own resources in an attempt to replace Bear Stearns's assistance [and] failed to realize additional profits." As a remedy for plaintiff's alleged fraud and/or negligent misrepresentation, defendants did not seek to rescind the RSA. Rather, they sought damages in an amount to be proven at trial.

In support of their reformation counterclaim, defendants alleged: "To the extent that the written terms of the RSA fail to reflect the agreement on revenue-sharing reached between Bear Ste[a]rns and Hayground and set forth in the Letter Agreement, that failure was on account of either mutual mistakes by the parties, or unilateral mistake by Hayground and improper conduct by Bear Stearns in seeking to conceal the mistake through expressing its agreement with Hayground's understanding of the parties' agreement."

Stating that the RSA should be reformed to provide that the expense cap is deducted after calculating Bear Stearns's 25% Revenue Share, as provided in the letter agreement, defendants sought damages "in an amount to be proven at trial, including, without limitation, all payments made to Bear Stearns that improperly overpaid Revenue Share based on the RSA's erroneous reflection of the parties' intent."

In July 2012, plaintiffs filed a note of issue noticing a bench trial. In August 2012, defendants filed a demand for a jury trial on the fraudulent inducement counterclaim. Plaintiff moved to strike the jury demand on the grounds that the RSA provided that the parties "waive all right to trial by jury in any action or proceeding to enforce or defend any rights under [the RSA]" and that in any event defendants waived any right to a jury trial by joining their fraudulent inducement counterclaim seeking monetary relief with a claim seeking the equitable relief of reformation. Supreme Court held that the jury waiver in the RSA applied to the fraudulent inducement claim, and that, as a result, there was no need to address plaintiff's waiver-by-joinder argument.

Where a fraudulent inducement claim challenges the validity of the agreement, a provision waiving the right to a jury trial in any litigation arising out of the agreement does not apply (see e.g. China Dev. Indus. Bank v Morgan Stanley & Co. Inc., 86 AD3d 435, 436-437 [1st Dept 2011]; Wells Fargo Bank, N.A. v Stargate Films, Inc., 18 AD3d 264 [1st Dept 2005]).

Where fraudulent inducement is the plaintiff's primary claim, "[i]t is of no consequence that the complaint does not contain the word 'rescission' or expressly state that it challenges the validity of the . . . agreement" (*Ambac Assur. Corp. v DLJ Mtge. Capital, Inc.*, 102 AD3d 487, 488 [1st Dept 2013]; *MBIA Ins. Corp. v Credit Suisse Sec. [USA], LLC*, 102 AD3d 488 [1st Dept 2013]).

Relying on *Ambac*, the majority finds that because defendants have sufficiently pleaded that they were fraudulently induced to enter into a contract, and only rely on that contract "as a basis for [their] defense against breach of contract allegations and a claim for reformation to recover overpayments, [they are] not precluded from challenging the validity of the contract for purposes of avoiding the jury waiver clause with respect to the adjudication of [their] fraudulent inducement claim." Because I believe that, on the particular facts presented, Supreme Court correctly determined that the jury waiver in the RSA applies, I respectfully disagree.

A party alleging fraudulent inducement may "elect to either disaffirm the contract by a prompt rescission or stand on the contract and thereafter maintain an action at law for damages attributable to the fraud" (*Big Apple Car v City of New York*, 204 AD2d 109, 110-111 [1st Dept 1994]). "The measure of damages recoverable for being fraudulently induced to enter into a contract which otherwise would not have been made is indemnity for [the] loss suffered through that inducement" (*Deerfield Communications Corp. v Chesebrough-Ponds, Inc.*, 68 NY2d 954, 956 [1986] [internal quotation marks omitted]; *RKB Enters. v Ernst & Young*, 182 AD2d 971 [3d Dept 1992]).

Here, defendants' primary claims are for reformation and monetary damages, and they did not raise fraudulent inducement as an affirmative defense to plaintiff's breach of contract claim. In their counterclaims for fraudulent inducement and negligent misrepresentation, defendants confirm that after learning of the alleged false or reckless misrepresentations that induced them to enter the RSA in 2004, they entered the 2005 Global Agreement and the 2005 Investment Agreement, in which they confirmed that the RSA remained a binding agreement. Moreover, defendants continued to perform under the RSA thereafter.

Although defendants do assert a counterclaim based on fraudulent inducement, they seek money damages, not rescission. Whereas rescission is based on a disaffirmance of the contract and seeks to place the parties in the status quo ante the transaction, an award of damages affirms the contract

while penalizing the fraudulent party for his breach (*see VisionChina Media Inc. v Shareholder Representative Servs., LLC*, 109 AD3d 49, 56 [1st Dept 2013]; *Vitale v Coyne Realty*, 66 AD2d 562, 568 [4th Dept 1979, Callahan, J., dissenting]). Furthermore, defendants assert a separate counterclaim seeking to reform the RSA with respect to the expense cap and to recover all overpayments of revenue share based on the RSA's alleged erroneous reflection of the parties' intent, thereby contesting the validity of Bear Stearns's contractual right to those payments under the RSA.

Thus, as the motion court found, unlike *Ambac*, where there was nothing to indicate that the plaintiff elected to affirm the contract after discovering the defendant's alleged fraud, here, "Hayground's actions—seeking damages and, in particular, reformation instead of rescission, declining to assert fraud as a defense to the breach of contract claim, and ratifying the RSA through the 2005 amendment—unequivocally demonstrate that it has elected to affirm the RSA and not challenge its validity" (2014 NY Slip Op 31017[U], *5 [Sup Ct, NY County 2014]).

Insofar as defendants argue that their fraudulent inducement counterclaim does not seek to enforce or defend any rights under the RSA, the argument is unavailing since the parties did not specify that the waiver would operate as to claims, but rather as to an "action or proceeding."